UNITED STATES of America, Plaintiff,

v.

Daniel HUNTER, D. Bruce Clark, Kent Lomont, Defendants.

UNITED STATES of America, Plaintiff,

v.

Daniel HUNTER, John Stemple, Robert Landies, George Dodson, Defendants.

Nos. 92–CR–80769–DT, 92–CR–80770–DT.

United States District Court, E.D. Michigan, S.D.

Jan. 24, 1994.

Asst. U.S. Atty., Diane Donohue, Detroit, MI, for plaintiff.

Richard O'Neill, Federal Defenders Office, Detroit, MI, for Hunter.

Stuart Benis, Colombus, OH, for Clark.

Steven Halbrook, Fairfax, VA, for Lomont.

James Jeffries, Greensboro, NC, for Landies.

Ed Wishnow, Southfield, MI, for Dodson.

## OPINION AND ORDER

ROSEN, District Judge.

### I. INTRODUCTION

In these consolidated cases, the United States has charged Daniel Hunter, D. Bruce Clark, Kent Lomont, John Stemple, Robert Landies, and George Dodson with conspiracy to violate federal statutes regulating the manufacture, transfer, and possession of machineguns. Defendants are gun manufacturers and dealers from Michigan, Ohio and Indiana. They have raised a number of pretrial motions on which the Court heard oral argument on September 22, 1993. After careful review of the issues raised, the Court is now prepared to rule on these motions. This Memorandum Opinion and Order sets forth that ruling.

### II. FACTUAL BACKGROUND

#### A. PROLOGUE.

Before 1986, any federally licensed gun manufacturer or dealer could make and transfer a machinegun as long as he followed the procedures of the National Firearms Act ("NFA"), I.R.C. §§ 5801–5872, and the Gun Control Act ("GCA"), 18 U.S.C. §§ 921–930. Passed in 1934, the NFA is a taxing statute that generated revenue for the Government by mandating the registration and taxation of certain types of firearms (machineguns, silencers, sawed-off shotguns, etc.). The GCA, for its part, regulates through criminal penalties the interstate flow of all firearms. The Department of Treasury's Bureau for Alco-

hol, Tobacco and Firearms ("ATF") is the federal agency in charge of enforcing these statutes.

In 1986, Congress enacted 18 U.S.C. § 922(*o*) as part of a series of GCA amendments known as the Firearm Owners' Protection Act (FOPA). Section 922(*o*) reads:

(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.

(2) This subsection does not apply with respect to—

(A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency or political subdivision thereof; or

(B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

Daniel Hunter, one of the Defendants in this case, registered approximately 1700 machineguns just prior to § 922(*o*)'s effective date of May 19, 1986. Both the U.S. Attorney and ATF acknowledge that he should not have been allowed to do so. In fact, an ATF agent looked at his inventory and recommended to ATF that it deny the registrations. ATF overlooked this request and approved the 1700 machinegun registrations.

The essence of the indictments is that Hunter's 1700 machinegun registrations were used to provide a paper cover for the illegal transfer and possession of machineguns. A more specific review of the counts of the indictments is set forth below.

#### B. NO. 92–80769. UNITED STATES v. HUNTER, CLARK & LOMONT.

##### 1. Count I: Conspiracy To Violate Federal Firearm Laws Under 18 U.S.C. § 371 (Hunter, Clark, Lomont).[1]

This count alleges that on May 5, 1986, Daniel Hunter, a federally licensed firearms

---

1. 18 U.S.C. § 371 reads: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the

dealer in the Eastern District of Michigan d/b/a Broadhead Armory, Inc., signed and filed seven ATF Form 2s (Notice of Firearms Manufactured or Imported) showing the manufacture of 75 .45 caliber machineguns, bearing serial numbers HM 001–HM 075. Delwin Wirth, a federally licensed firearms dealer in Wisconsin, approached Defendant Kent Lomont, a federally licensed firearms manufacturer in Indiana d/b/a Lomont's Precision Bullets, in April, 1987, at the Nob Creek Machinegun Shoot in Kentucky. Wirth told Lomont that he wanted registrations for four machinegun receivers which Wirth had in his possession. Lomont directed Wirth to Defendant Daniel Hunter. Wirth spoke with Hunter that same day about the transaction. Wirth later arranged to have Gary Rasmussen listed as the transferee of the receivers; Rasmussen is a federally licensed firearms dealer in Wisconsin.

On August 28, 1987, Hunter submitted four ATF Form 3s (Application for Tax–Exempt Transfer of Firearm & Registration to Special (Occupational) Taxpayer) to ATF requesting permission to transfer four machinegun receivers bearing serial numbers HM 066–HM 069 to Rasmussen. In October, 1987, Hunter gave to Wirth the approved Form 3s. Wirth met with Defendant D. Bruce Clark, a federally licensed firearms dealer (and after July, 1989, a licensed manufacturer) in Ohio d/b/a Fort Howard, in October, 1987. Wirth arranged for Clark to manufacture four machineguns with Wirth's receivers. Wirth and Clark agreed that the machineguns would bear Hunter's serial numbers. Hunter made entries in his books on October 4, 11 and 13, 1987, showing the transfer of four machineguns with serial numbers HM 066–HM 069 to Rasmussen;

Rasmussen made entries in his federally mandated bound book on October 16 showing the receipt of four machineguns from Hunter with those same serial numbers.

On November 19, 1987, Rasmussen signed and filed ATF Form 3s requesting permission to transfer four machineguns with serial numbers HM 066–HM 069 to Clark. After these were approved, Wirth shipped the receivers to Clark on December 3, 1987. On December 12, Clark made an entry in his bound book showing the receipt of four machineguns manufactured at the Broadhead Armory. According to the indictment, despite Hunter and Rasmussen's records, only Wirth and Clark ever had possession of the machinegun receivers. On March 8, 1989, Clark still had the four receivers with serial numbers HM 066–HM 069 in his possession. The indictment alleges that all of these acts constituted a conspiracy to violate 18 U.S.C. § 922(*o*), and also 18 U.S.C. §§ 923(g)(1)(A) [2], 924(a)(1)(D) [3] and 924(a)(2).[4]

### 2. *Count II: Possession of Machineguns in Violation of 18 U.S.C. § 922(o) (Clark).*

On or about March 8, 1989, Clark possessed four machinegun receivers with serial numbers HM 066–HM 069 in violation of 18 U.S.C. § 922(*o*).

### 3. *Count III: False or Fraudulent Statements in Violation of 18 U.S.C. § 1001 [5] (Hunter).*

On or about August 28, 1987, Hunter filed false ATF Form 3s requesting permission to transfer machinegun receivers to Rasmussen.

---

conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.''

**2.** Section 923(g)(1)(A) reads: ''Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Secretary may by regulations prescribe....''

**3.** Section 924(a)(1)(D) reads: ''Except as otherwise provided ... whoever—(D) willfully violates

any other provision of this chapter, shall be fined not more than $5,000, imprisoned not more than five years, or both.''

**4.** Section 924(a)(2) reads: ''Whoever knowingly violates subsection ... (*o*) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both.''

**5.** Section 1001 reads: ''Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any

### C. NO. 92–80770, UNITED STATES v. HUNTER, STEMPLE, LANDIES AND DODSON.

#### 1. Count I: Conspiracy To Violate Federal Firearms Laws In Violation Of 18 U.S.C. § 371.

Prior to 1986, George Dodson, who was neither a federally licensed firearms manufacturer or dealer, arranged for the manufacture and/or acquisition of M–2, M–10, and M–11 .30 caliber machinegun conversion kits. Before May, 1986, Dodson agreed to transfer the conversion kits to Daniel Hunter, a licensed firearm manufacturer in the Eastern District of Michigan d/b/a Broadhead Armory, Inc. Hunter, in turn, filed registration forms with ATF on May 7, 1986, showing that the Broadhead Armory manufactured the conversion kits.[6]

On May 28, 1987, Hunter signed and forwarded twenty ATF Form 3s requesting permission to transfer twenty M–1 and M–2 .30 caliber carbine conversion kits with serial numbers BAV 082–BAV 101 to John Stemple, a federally licensed firearms manufacturer in Ohio. On August 31, 1987, Stemple made an entry in his bound book showing receipt of the twenty conversion kits listed above from Hunter, even though he allegedly received the weapons directly from Dodson. On September 2, 1987, Stemple filed and forwarded ATF Form 3s requesting permission to transfer the above twenty conversion kits to Robert Landies, a federally licensed firearms manufacturer in Ohio d/b/a Collector's Corner. The Form 3s showed the conversion kits as being .50 caliber machineguns. On September 18, 1987, Landies made an entry in his bound book showing receipt of twenty ".50 caliber full auto[s]."

On December 7, 1989, Landies still had in his possession the twenty .30 caliber conversion kits with serial numbers BAV 082–BAV 101. On December 14, 1987, Hunter had in his possession 328 conversion kits manufactured by Dodson but registered as being manufactured by himself. Similarly, on March 8, 1988, Stemple had in his possession some 75 conversion kits manufactured by Dodson but registered as being manufactured by Hunter. On July 10, 1989, Hunter had in his possession 299 conversion kits he received from Dodson but listed as being manufactured by himself. And, on March 21, 1990, Stemple had in his possession 87 conversion kits which he received from Dodson, but which were registered as being manufactured by Hunter.

The indictment alleges that all these acts violated 18 U.S.C. § 371. In particular, the indictment alleges that the Defendants knowingly conspired to violate 18 U.S.C. §§ 922(a)(1)(A)[7], 922(o), 923(g)(1)(A), 924(a)(1)(D), and 924(a)(2).

#### 2. Count II: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Landies).

On or about December 7, 1989, Landies knowingly possessed twenty machinegun conversion kits with serial numbers BAV 082–BAV 101 in violation of § 922(o).

#### 3. Count III: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Hunter).

On or about December 14, 1987, Hunter knowingly possessed 328 machinegun conversion kits in violation of § 922(o).

#### 4. Count IV: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Stemple).

On or about March 8, 1988, Stemple knowingly possessed 75 machinegun conversion kits in violation of § 922(o).

---

false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned for not more than five years, or both."

**6.** Specifically, Hunter filed 44 ATF Form 2s showing the manufacture of 461 conversion kits (101 M–2 carbine conversion kits with serial numbers BAV 001–BAV 101; 34 M–10 one-piece

conversion kits with serial numbers BAL 001–BAL 034; and 326 M–11 one-piece conversion kits with serial numbers BAM 001–BAM 326).

**7.** Section 922(a)(1)(A) reads: "It shall be unlawful for any person except a licensed importer, licensed manufacturer, or licensed dealer to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce...."

**5.** *Count V: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Hunter).*

On or about July 10, 1989, Hunter knowingly possessed 299 machinegun conversion kits in violation of § 922(o).

**6.** *Count VI: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Stemple).*

On or about March 21, 1990, Stemple knowingly possessed 87 machinegun conversion kits in violation of § 922(o).

**7.** *Count VII: False Or Fraudulent Statements In Violation Of 18 U.S.C. § 1001 (Stemple).*

On September 2, 1987, Stemple knowingly filed false ATF Form 3s to transfer machinegun conversion kits to Landies.

**8.** *Count VIII: Engaging In The Business Of Firearms Without A License In Violation Of 18 U.S.C. §§ 922(a)(1)(A) And (a)(2)* [8] *(Hunter, Stemple, Dodson).*

From on or about September, 1987, through March, 1990, Hunter, Stemple and Dodson willfully engaged in firearms dealing without a license in violation of §§ 922(a)(1)(A) and 922(a)(2).

### III. *ANALYSIS*

#### A. *SECTION 922(o) IS CONSTITUTIONAL.*

##### 1. *Introduction.*

■ Defendants have moved to dismiss the indictments on the ground that the Congressional enactment of § 922(o) is not a valid exercise of the Commerce Clause. That provision reads: "The Congress shall have the power * * * To regulate commerce with foreign nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8, cl. 3. Specifically, Defendants assert that for Congress to prop-

erly exercise its commerce power, two things must occur: (i) Congress must state on the face of the statute or in its legislative history the impact of the regulated activity on interstate commerce, and (ii) Congress' determination that the regulated activity falls within the Commerce Clause's grant of authority must be reasonable. For the reasons set forth below, the Court holds that § 922(o) does not violate the Commerce Clause.

■ This is not the first case in which this Court has had reason to examine a statute challenged under the Commerce Clause. In *Michigan Protection & Advocacy Serv. v. Babin,* 799 F.Supp. 695, 742 (E.D.Mich.1992), this Court held that Congress could not regulate the private sale of a home between neighbors under the Commerce Clause. The Commerce Clause analysis in *Babin* began by noting that:

> Judicial review of Commerce Clause legislation is not exacting. A court reviewing legislation under the Commerce Clause "must defer to a congressional finding that a regulated activity affects interstate commerce 'if there is any rational basis for such a finding'" *Preseault v. ICC,* 494 U.S. 1 [17], 110 S.Ct. 914, 924, 108 L.Ed.2d 1 (1990) (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264 [276], 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981)). As the Supreme Court wrote in *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964):
>
> > *Of course, the mere fact that Congress has said when particular activity shall be deemed to affect commerce does not preclude further examination by this Court.* But where we find that the legislators, in light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end.
>
> [379 U.S. at 303–04] 85 S.Ct. at 383. In sum, judicial review is no longer necessary once a court determines that Congress had a rational basis for believing that a particu-

---

**8.** Section 922(a)(1)(A) is quoted *supra,* n. 7. Section 922(a)(2) reads: "It shall be unlawful for any importer, manufacturer, dealer, or collector licensed under the provision of this chapter to ship or transport in interstate or foreign commerce any firearm to any person other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector...."

lar activity has a substantial effect on interstate commerce.

*Babin,* 799 F.Supp. at 733 (emphasis added). *Babin* thus set forth two important Commerce Clause principles. First, judicial review is deferential to Congress' interpretation of its commerce power. Second, as indicated by the excerpt from *McClung,* a court's examination of whether Congress acted within that power is independent of any Congressional findings. In other words, just because Congress has stated explicitly or implicitly in the statute or its legislative history that it believes the regulated activity falls within the commerce power, a court's responsibility for inquiry does not end. Instead, the court must conduct its own examination of the statute, its legislative history, and any other information available to Congress at the time of the enactment to determine if indeed Congress was rational in its belief that it could legislate.

■ In *Babin,* the Court next discussed at some length the somewhat tortured history of the Commerce Clause, and set forth its understanding of that provision's precedential evolution:

> To be within the ambit of the Commerce Clause, an activity originally had to be commerce that moved across state lines. With time, courts began to hold that the commerce need only affect movement across state lines. Finally, courts dropped the commerce requirement and applied the Clause to any activity that affects commerce that, in turn, affects movement across state lines. The sole remaining limitation on Congress' power under the Commerce Clause is the requirement that the effect on commerce be *substantial.*

799 F.Supp. at 735 (emphasis in original).

■ Lastly, the Court outlined what, in its view, was an appropriate standard for determining what activities have a substantial effect on interstate commerce:

> The Court interprets the phrase "substantial effect" as having two interrelated parts. First, the regulated activity, alone or in the aggregate, must result in a significant quantity of interstate transactions.

Purely isolated examples of interstate movement are insufficient to bring an activity within the scope of the Commerce Clause. Second, the regulated activity, alone or in the aggregate, must have a *direct causal nexus* to interstate commerce. It is not sufficient that the regulated activity affect another activity which, in turn, has a substantial interstate commerce effect. Rather, the interstate effect must be brought about directly by the regulated activity.

799 F.Supp. at 740 (emphasis in original).

In the context of the instant case, the Court will review pertinent precedent and integrate its analysis in *Babin* with the facts presented here.

### 2. Section 922(o) Is A Lawful Exercise Of The Commerce Power.

**a. The Supreme Court has never required Congress to explicitly state the interstate commerce nexus upon which a statute passed under the commerce power relies, either on the face of the statute or in its legislative history.**

■ Defendants argue first that no statute enacted under the commerce power may pass constitutional muster unless Congress, either on the face of the statute or in its legislative history, spells out the nexus between the regulated activity and interstate commerce. Defendants rely primarily on *United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). That case involved a conviction under 18 U.S.C.App. § 1202(a), since repealed in 1986, which read:

> Any person who has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony . . . and who receives, possesses, or transports in commerce or affecting commerce . . . any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.[9]

The issue in *Bass* was whether "in commerce or affecting commerce" was an element of a possession or receipt offense under the statute as well as a transport offense. The Supreme Court held that it was. A

---

**9.** Congress replaced this statute with what is now 18 U.S.C. § 922(g) in 1986.

review of the statute itself and its legislative history left the Court uncertain as to whether Congress intended to ban the mere possession and receipt of firearms by felons. The Court, therefore, invoked two principles of statutory construction in holding that the interstate commerce nexus was an element of the crime. 404 U.S. at 338–48, 92 S.Ct. at 518–22.

First, the Court noted that "'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" 404 U.S. at 346–48, 92 S.Ct. at 522 (quoting *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971)). Second, and more directly applicable to an analysis of the instant case, the Court held:

There is a second principle supporting today's result: unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States. This Congressional policy is rooted in the same concepts of American federalism that have provided the basis for judge-made doctrines. See, e.g., *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). As this Court emphasized only last term in *Rewis v. United States, supra*, we will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced and intended to bring into issue, the critical matters involved in the judicial decision. In *Rewis*, we declined to accept

an expansive interpretation of the Travel Act.[10] To do so, we said then, "would alter sensitive federal-state relationships [and] could overextend limited federal police resources." While we noted there that "[i]t is not for us to weigh the merits of these factors," we went on to conclude that "the fact that they are not even discussed in the legislative history ... strongly suggests that Congress did not intend that [the statute have the broad reach]." 401 U.S. at 812, 91 S.Ct. at 1059. In the instant case, the broad construction urged by the Government renders traditionally local criminal conduct a matter for federal enforcement and would also involve a substantial extension of federal police resources. Absent proof of some interstate commerce nexus in each case, § 1202(a) dramatically intrudes upon traditional state criminal jurisdiction. As in *Rewis*, the legislative history provides scanty basis for concluding that Congress faced these serious questions and meant to affect the federal-state balance in the way now claimed by the Government. Absent a clearer statement of intention from Congress than is present here, we do not interpret § 1202(a) to reach the "mere possession" of firearms.

404 U.S. at 348–52, 92 S.Ct. at 523–24 (footnotes omitted). Significantly, the Court did not reach the question of "whether, upon appropriate findings, Congress can constitutionally punish the 'mere possession' of firearms." 404 U.S. at 338–39, 92 S.Ct. at 518 n. 4.[11]

Nowhere in *Bass*, however, did the Court state that Congress *must* make findings to support its exercise of the commerce power or that it must include an interstate commerce nexus as part of every offense enacted

**10.** In *Rewis*, the Supreme Court reversed convictions under the Travel Act, which prohibited interstate travel with the intent to promote criminal activities. Defendants in *Rewis* were owners of an illegal gambling operation on the Georgia–Florida border. The government obtained their convictions on the theory that such operators "are responsible for the interstate travel of their customers" and thus fell within the class of people subject to the statute. 401 U.S. at 811–12, 91 S.Ct. at 1059. In addition to citing the principle of lenity, the Court also stated in support of its

reversal of the convictions that "neither statutory language nor legislative history" supported such a theory. 401 U.S. at 811–12, 91 S.Ct. at 1059. The reasoning of *Rewis* is further discussed in the text above.

**11.** The Court, therefore, did not consider how *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), discussed *infra*, might apply to *Bass*. 404 U.S. at 338–39, 92 S.Ct. at 518 n. 4.

under that power. Indeed, such a ruling would have been contrary to another Supreme Court decision issued just eight months before *Bass.*

In *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), the Court upheld against a Commerce Clause challenge a provision of the Consumer Credit Protection Act which prohibited loan sharking. Defendant was convicted under this provision for purely intrastate loan sharking activities. The Court affirmed his conviction with the following reasoning:

> Where the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power "to excise, as trivial, individual instances" of the class. *Maryland v. Wirtz,* 392 U.S. 183, 193, 88 S.Ct. 2017, 2022, 20 L.Ed.2d 1020, 1029.
>
> Extortionate credit transactions, though purely intrastate, may in the judgment of Congress affect interstate commerce. In an analogous situation, Mr. Justice Holmes, speaking for a unanimous Court, said: "[W]hen it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so." *Westfall v. United States,* 274 U.S. 256, 259, 47 S.Ct. 629 [629–30], 71 L.Ed. 1036, 1037. In that case an officer of a state bank which was a member of the Federal Reserve System issued a fraudulent certificate of deposit and paid it from the funds of the state bank. It was argued that there was no loss to the Reserve Bank. Mr. Justice Holmes replied, "But every fraud like the one before us weakens the member bank and therefore weakens the System." *Id.* at 259, 47 S.Ct. at 629. In the setting of the present case there is a tie-in between local loan sharks and interstate crime.

402 U.S. at 150–54, 91 S.Ct. at 1360–61 (emphasis in original).

The Court then analyzed the information before Congress when it considered the loan sharking provision. The Court concluded:

> The essence of all these reports and hearings was summarized and embodied in formal congressional findings. They supplied Congress with the knowledge that the loan

shark racket provides organized crime with its second most lucrative source of revenue, exacts millions from the pockets of people, coerces its victims into the commission of crimes against property, and causes the takeover by racketeers of legitimate businesses. *See generally* 114 Cong. Rec. 14391, 14392, 14395, 14396.

> We have mentioned in detail the economic, financial, and social setting of the problem as revealed by Congress. *We do so not to infer that Congress need make particularized findings in order to legislate.* We relate the history of the Act in detail to answer the impassioned plea of petitioner that all that is involved in loan sharking is traditionally local activity. It appears, instead, that loan sharking in its national setting is one way organized interstate crime holds its guns to the heads of the poor and the rich alike and syphons funds from numerous localities to finance its national operations.

402 U.S. at 154–58, 91 S.Ct. at 1362–63 (emphasis added). *See also Katzenbach v. McClung,* 379 U.S. 294, 298–300, 85 S.Ct. 377, 381, 13 L.Ed.2d 290 (1964) ("As we noted in *Heart of Atlanta Motel* [*v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) ] both Houses of Congress conducted prolonged hearings on the [Civil Rights] Act. *And, as we said there, while no formal findings were made, which of course are not necessary, it is well that we make mention of the testimony at these hearings to better understand the problem before Congress and determine whether the Act is a reasonable and appropriate means toward its solution.*") (emphasis added).

■ *Perez* and *McClung* clearly state that Congress need not make findings of a burden on interstate commerce in order to legislate under the Commerce Clause. Moreover, *Perez* holds that Congress may bar purely intrastate activity—such as loan sharking, or, in this case, machinegun possession—if it was reasonable in believing that such activity in fact burdens interstate commerce.

The Court draws further support for its holding that there is no constitutional requirement that Congress make findings in

order to legislate from Justice Powell's thoughtful concurrence in *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). In that case, contracting associations challenged an affirmative action provision contained in § 103(f)(2) of the Public Works Employment Act of 1977. They asserted, *inter alia,* "that a reviewing court may not look beyond the legislative history of the PWEA itself for evidence that Congress believed that it was combating invidious discrimination." 448 U.S. at 502–03, 100 S.Ct. at 2787 (Powell, J., concurring). Justice Powell rejected this argument, stating "petitioners' theory would erect an artificial barrier to full understanding of the legislative process." 448 U.S. at 502–03, 100 S.Ct. at 2787. He elaborated further on this view:

> Congress is not an adjudicatory body called upon to resolve specific disputes between competing adversaries. Its constitutional role is to be representative rather than impartial, to make policy rather than to apply settled principles of law. The petitioners' contention that this Court should treat the debates on § 103(f)(2) as the complete "record" of congressional decisionmaking underlying the statute is essentially a plea that we treat Congress as if it were a lower federal court. But Congress is not expected to act as though it were duty bound to find facts and make conclusions of law. The creation of national rules for the governance of our society simply does not entail the same concept of recordmaking that is appropriate to a judicial or administrative proceeding. Congress has no responsibility to confine its vision to the facts and evidence adduced by particular parties. Instead, its special attribute as a legislative body lies in its broader mission to investigate and consider all facts and opinions that may be relevant to the resolution of an issue. One appropriate source is the information and expertise that Congress acquires in consideration and enactment of earlier legislation. After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in an area.

> *Acceptance of petitioners' argument would force Congress to make specific factual findings with respect to each legislative action. Such a requirement would mark an unprecedented imposition of adjudicatory procedures upon a coordinate branch of Government.* Neither the Constitution nor our democratic tradition warrants such a constraint on the legislative process. I therefore conclude that we are not confined in this case to an examination of the legislative history of § 103(f)(2) alone. Rather, we properly may examine the total contemporary record of congressional action dealing with the problems of racial discrimination against minority business enterprises.

448 U.S. at 502–03, 100 S.Ct. at 2787 (emphasis added).

The Court agrees with Justice Powell's analysis of the differing fact-finding roles of Congress and the judiciary. The Court, therefore, declines to accept Defendants' invitation to impose the more rigorous fact-finding inquiry required of courts upon the national legislature.

The Court does not read *Bass* as reaching a contrary conclusion. Defendants place much emphasis on the fact that in that opinion, the Court stated that:

> In light of our disposition of the case, we do not reach the question whether, *upon appropriate findings,* Congress can constitutionally punish the "mere possession" of firearms; thus, we need not consider the relevance, in that connection, of our recent decision in *Perez v. United States. . . .*

404 U.S. at 338–39, 92 S.Ct. at 518 n. 4 (emphasis added). The Court does not believe that this dicta, on a matter not even reached by the *Bass* Court, contradicts the statements in *Perez, McClung* and Justice Powell's concurrence in *Fullilove* that Congress need not make findings to legislate. Indeed, the language in *Bass* on which Defendants rely itself states that the Court did not consider how *Perez* might affect the outcome. Absent a clearer statement from the Supreme Court that Congress must make

findings to legislate under the Commerce Clause, this Court will not impose such a requirement.[12]

Beyond this, the Court believes that *Bass* does not control this case for another reason. *Bass* held that when a federal statute infringes on an area of traditional state regulation, such as the possession of weapons, Congress must clearly state it so intends to infringe. 404 U.S. at 348–54, 92 S.Ct. at 523–24. In *Bass,* the statute was ambiguous as to whether an interstate commerce nexus was an element of a possession offense or not. The Court therefore read the statute to require a showing of a nexus with interstate commerce because Congress did not clearly indicate whether it meant to ban mere possession. 404 U.S. at 350–54, 92 S.Ct. at 524.

In the instant case there is no such ambiguity. Section 922(*o*) bars the possession of certain machineguns, period. As Defendants have pointed out, every other provision of § 922 has interstate commerce as an element of the crime. The Court, therefore, cannot conclude that the absence of this element in § 922(*o*) was merely a drafting oversight. By passing the provision, Congress clearly stated that there now existed an outright ban on certain machineguns. The "clear statement" rule of *Bass* is therefore fulfilled by virtue of the terms of § 922(*o*) itself. *See United States v. Culbert,* 435 U.S. 371, 98 S.Ct. 1112, 1116–1117 (1978) ("The two maxims [of lenity and clear statement as set out in *Bass* ] only apply 'when we are uncertain of the statute's meaning'. . . .") (citation omitted).

In the end, the real problem with Defendants' argument here is that it would raise to the level of a constitutional right a requirement that Congress, in legislating, make findings upon which its constitutional authority to enact laws is based. Although such findings in legislation or legislative history may well facilitate constitutional analysis by the courts, there is no requirement of such findings under the Constitution. Concomitantly, Defendants may not be heard to claim as a constitutional defense that a statute is constitutionally infirm if it does not include such a finding. Just as a court's responsibility for inquiry into the validity of a statute under the Commerce Clause does not end just because Congress makes a finding that a regulated activity burdens interstate commerce, the fact that Congress does not make such a finding does not end a Court's inquiry into the constitutionality of a statute under the Commerce Clause. The Commerce Clause inquiry is a judicial responsibility quite independent of congressional action or inaction.

The Court will now proceed to the central question of Commerce Clause review set out in *Babin:* Is there a rational basis for finding that the mere possession and transfer of machineguns substantially affected interstate commerce?

**b. There is a rational basis for concluding that the possession and transfer of machineguns substantially affected interstate commerce.**

■ Defendants correctly point out that the legislative record on § 922(*o*) is hardly complete. The provision was a last-second floor amendment; no hearings were conducted, no committee report refers to it, and there was little discussion on the floor before its passage. *See* David T. Hardy, *The Firearms Owners' Protection Act: A Historical and Legal Perspective,* 17 CUMB.L.REV. 585, 670–71 (1987). While this Court has held that Congress need not make findings in order to legislate, the existence of a legislative record is, as the Court has noted, nonetheless helpful in making the independent

---

**12.** Thus, this Court declines to follow *United States v. Lopez,* 2 F.3d 1342 (5th Cir.1993), cited by Defendants, which held that Congress exceeded its commerce power in enacting 18 U.S.C. § 922(q). That statute bars the possession of a firearm within 1000 feet of a schoolyard. *Lopez* ruled, in effect, that Congress bore the burden to show to a reviewing court that it acted properly under the Commerce Clause: "Here Congress surely intended to make the possession of a firearm near a school a federal crime, but it has not taken the steps necessary to demonstrate that such an exercise of power is within the scope of the Commerce Clause." 2 F.3d at 1365–66. Because this Court does not believe that the Constitution or precedent mandates that Congress make such a demonstration, it rejects the basis on which *Lopez* struck down § 922(q). *See also United States v. Edwards,* 13 F.3d 291 (9th Cir. 1993) (rejecting the reasoning of *Lopez* and upholding the constitutionality of § 922(q)).

judicial determination that Congress rationally believed its actions were consistent with its commerce power.

Despite the absence of a fully developed legislative record for § 922(*o* ), the Court believes that Congress did rationally exercise the commerce power in enacting the provision. Congress has long regulated the interstate flow of firearms under the commerce power. First, in 1938, it passed the Federal Firearms Act ("FFA"). That statute prohibited various transfers of firearms by licensed as well as unlicensed gun dealers. *See United States v. Lopez,* 2 F.3d 1342, 1349 (5th Cir.1993).

Next, in 1968, Congress replaced the FFA with the more comprehensive Omnibus Crime Control and Safe Streets Act. In the Omnibus Act itself, Congress expressly found:

that there is a widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable States to control this traffic within their own borders through the exercise of their police power.

P.L. No. 90–351, § 901(a)(1).

Later in 1968, the Omnibus Act was superseded in its turn by the GCA. The legislative history to that statute also indicates that Congress believed that tough controls on the interstate flow of firearms were necessary to help local communities prevent violent crimes:

The increasing rate of crime and lawlessness and the growing use of firearms in violent crime clearly attest to a need to strengthen Federal regulation of interstate firearms traffic.

The subject legislation responds to widespread national concern that existing Federal control over the sale and shipment of firearms across state lines is grossly inadequate.

Handguns, rifles, and shotguns have been the chosen means to execute three-quarters of a million people in the United States since 1900. The use of firearms in violent crime continues to increase today. Statistics indicate that 50 lives are destroyed by firearms each day. In the 13 months ending in September 1967 guns were involved in more than 6,500 murders, 10,000 suicides, 2,600 accidental deaths, 43,500 aggravated assaults and 50,000 robberies. No civilized society can ignore the malignancy which this senseless slaughter reflects.

H.R.Rep. No. 1577, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 4410, 4413. A letter from the attorney general attached to this House Report added:

By recognizing the Federal responsibility to control the indiscriminate flow of firearms and ammunition across State borders, this bill will give States and local communities the capacity and incentive to enforce effectively their own gun control laws. Once enacted into law, it will insure that strong local and State laws are not subverted by a deadly interstate traffic in firearms and ammunition.

1968 U.S.C.C.A.N. at 4425.

As of 1968, then, Congress had three times enacted statutes under its commerce power which sought to regulate the interstate flow of firearms as an aid to local law enforcement efforts. The 1986 FOPA, which included § 922(*o* ), continued in this policy. A committee report on a predecessor bill to FOPA stated:

H.R. 4332 is designed to relieve the nation's sportsmen and firearms owners and dealers from unnecessary burdens under the Gun Control Act of 1968, *to strengthen the Gun Control Act of 1968 to enhance the ability of law enforcement to fight violent crime and narcotics trafficking,* and to improve administration of the Act.

H.R.Rep. No. 495, 99 Cong., 2d Sess. 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1327 (emphasis added).

Turning more specifically to § 922(*o* ) itself, the language of the statute and what little legislative history does exist on it demonstrate that Congress wanted to regulate possession and transfer of machineguns as a means of stemming interstate gun trafficking. Importantly, the statute does not ban the possession and transfer of all machineguns. Indeed, it specifically excludes from

its scope of illegal activity both the transfer and possession of post–1986 machineguns under government authority *and* "any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect." 18 U.S.C. § 922(*o* )(2). Thus, the intent of the statute, clear on its face, was to limit transactions in *post*–1986 machineguns. *See United States v. Ferguson,* 788 F.Supp. 580, 581 (D.D.C. 1992) ("Under section 922(*o* )(2)(B), certain machineguns, namely, those that were lawfully possessed before enactment of the statute in 1986, may be legally possessed and transferred even today."). *See also United States v. O'Mara,* 827 F.Supp. 1468, 1470 n. 4 (C.D.Cal.1993) (quoting *Ferguson* ). The means Congress chose to accomplish its goal was to ban the transfer and possession of such weapons outright.

Congress' concern that future machinegun transactions not within § 922(*o* )'s exceptions would impede local law enforcement efforts does appear in the provision's legislative history. The following is a colloquy over the question of amnesty with respect to § 922(*o* ):

> MR. METZENBAUM.... Another question has been over granting amnesty to people who now possess machineguns outside of the law. As the Senator knows, this was one of the proposals offered this afternoon as part of this compromise package, but it was rejected by us, and strongly by law enforcement agencies.
>
> Do you believe that an amnesty period can be administratively declared by the Secretary of the Treasury by the enactment of this bill?
>
> MR. KENNEDY. Yes, I am aware of the discussions earlier today on the question of amnesty, and I joined the Senator in rejecting any such proposal.

There is nothing in the bill that gives such an authority, and there is clearly no valid law enforcement goal to be achieved by such open-ended amnesty.

> *The only thing that has changed about the machinegun situation since the 1968 act, and the limited amnesty granted then, is that machineguns have become a far more serious law enforcement problem.*
>
> So I see no new legislative authority or law enforcement purpose that would be served by such an amnesty—and that is the strongly held view of all the law enforcement groups, including the Federal Law Enforcement Officers Association.

132 Cong.Rec. S5358 (Tuesday, May 6, 1986).

When read together, then, § 922(*o* ) itself and the legislative records of the Omnibus Act, GCA, and FOPA demonstrate that Congress has sought to regulate the interstate flow of firearms, including machineguns, as a means to aid local law enforcement.[13] Congress has found in the past that firearms travel in interstate commerce and pose a threat to local law enforcement. Section 922(*o* ) merely takes Congressional regulation of this interstate flow of weapons one step further by barring most transactions involving post–1986 machineguns through a proscription against certain transfers and possessions.

Section 922(*o* ), then, is simply the latest means selected by Congress to achieve an end long regulable under the commerce power, namely, the regulation and policing of an interstate firearms market that is not capable of being addressed by purely local law enforcement efforts. Thus, although not explicitly stated in the language of the statute itself, it is evident that Congress prohibited the transfer and possession of most post–1986 machineguns not merely to ban these firearms, but, rather, to control their inter-

---

**13.** Defendants protest strongly that legislative history in 1968 cannot control what the Congress did in 1986. However, the Court again agrees with Justice Powell's concurrence in *Fullilove v. Klutznick, supra:*

> After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in an area.

100 S.Ct. at 2787 (Powell, J., concurring). The Court believes, then, that because Congress has repeatedly legislated on the interstate flow of firearms under its commerce power since 1938, the Court can look to prior enactments and legislative history to determine what guided Congress in its most recent action in 1986.

state movement by proscribing transfer or possession. If Congress had intended simply to ban possession outright, it would not have "grandfathered" the transfer and possession of machineguns lawfully possessed on the statute's effective date.

In terms of evaluating the means Congress chose to regulate the interstate movement of machineguns, the Court finds illuminating the analysis of another district court deciding § 922(*o* )'s constitutionality. In *United States v. Evans,* 712 F.Supp. 1435 (D.Mont. 1989), *aff'd* 928 F.2d 858 (9th Cir.1991), the court stated:

> It is beyond dispute the commerce power vests Congress with the authority to regulate the interstate transportation of products, including firearms. In the exercise of its legislative judgment, Congress has, in fact, deemed it appropriate to regulate the movement of certain firearms in interstate commerce. *The plenary nature of the commerce power vests Congress with the authority to determine the means by which to effectuate that regulation. The means by which Congress chooses to regulate the interstate movement of firearms "... is within the sound and exclusive discretion of Congress. It is subject only to one caveat—that the means chosen by it must be reasonably adapted to the end permitted by the Constitution....* The Constitution requires no more." *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 261–62, 85 S.Ct. 348, 359–60, 13 L.Ed.2d 258 (1964). *The defendants present no cogent argument which persuades the court it was irrational for Congress to conclude that even mere possession of a "machinegun" is an appropriate means to the attainment of a legitimate end, i.e., the effective regulation of the movement of machineguns in interstate commerce. See Perez v. United States,* 402 U.S. at 154, 91 S.Ct. at 1361.

712 F.Supp. at 1442 (footnote omitted) (emphasis added).

The Court notes that further support for Congress' decision to ban possession and transfer of many post–1986 machineguns as part of its regulation of interstate commerce can be found in the allegations of the indict-ments. These allegations demonstrate that there is indeed an interstate market for machinegun registrations and parts because all of the transfers in the instant case crossed state lines. That the machineguns eventually came to rest within a single state is of no consequence; the steps leading up to their possession took place in interstate commerce. This case is thus similar to *Perez,* in which the Supreme Court held that purely intrastate activity, if tied to interstate criminality, is properly regulable under the Commerce Clause.

Nothing said here is inconsistent with the Court's statements in *Babin.* In the instant case, the intestate flow of machineguns not only has a substantial effect on interstate commerce; it *is* interstate commerce. A machinegun is a commodity which is transferred across state lines for profit by business entities. It is not at all like the private sale between neighbors of a personal residence— a structure appended to the ground that is not moving across state lines, or anywhere else—which transaction this Court found unregulable under the Commerce Clause in *Babin.*

Given the extensive, intricate, and definitively national market for machineguns evidenced by these indictments, the Court cannot say that Congress acted irrationally in prohibiting the transfer and possession of most post–1986 machineguns as a means of regulating the interstate flow of such firearms. The motion to dismiss the indictments on the basis of § 922(*o* )'s unconstitutionality is denied.

**B.** ***I.R.C. § 5848 POSES NO BAR TO THESE PROSECUTIONS.***

■ Defendants also move to dismiss the indictments, quash search warrants and grand jury subpoenas, and to suppress evidence on the ground that the investigation was permeated by massive Government disregard of I.R.C. § 5848. That section reads:

> (a) **General rule.**—No information or evidence obtained from an application, registration, or records required to be submitted or retained by a natural person in order to comply with any provision of [the NFA] or regulations issued thereunder,

shall, except as provided in subsection (b) of this section, be used, directly or indirectly as evidence against that person in a criminal proceeding with respect to a violation of law occurring prior to or concurrently with the filing of the application or registration, or the compiling of the records containing the information or evidence.

**(b) Furnishing false information.**—Subsection (a) of this section shall not preclude the use of any such information or evidence in a prosecution or other action under any applicable provision of law with respect to the furnishing of false information.

The parties do not dispute that this section applies to these cases. Defendants filed the ATF forms and kept the bound book records mentioned in the indictments pursuant to the dictates of the NFA.

Defendants argue that the searches of their premises grew out of Government use of filings and records protected by this section. Defendants further assert that the Government should not be able to use such filings and records in this prosecution. They ask the Court to dismiss the indictments or, in the alternative, to conduct a *Kastigar* hearing to determine if the Government has an untainted source for its evidence. *See Kastigar v. United States,* 406 U.S. 441, 460–62, 92 S.Ct. 1653, 1665, 32 L.Ed.2d 212 (1972) (holding that if the government prosecutes a person after granting him use immunity, it must show its evidence was derived from a completely independent source).

Section 5848 was passed by Congress in 1968 in response to the Supreme Court's decision in *Haynes v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968). In *Haynes,* the Court held that invocation of the Fifth Amendment right against self-incrimination was a complete defense to then I.R.C. § 5851, which read:

> It shall be unlawful for any person to receive or possess any firearm which has *at any time* been transferred in violation of [various provisions of the NFA] or which has *at any time* been made in violation of § 5821 [of the NFA], or to possess any firearm which has not been registered

as required by § 5841 [of the NFA]. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such firearm, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

*Haynes,* 390 U.S. at 87 n. 3, 88 S.Ct. at 725 n. 3 (emphasis added).

The Supreme Court believed that this provision placed illegal firearm possessors in an unconstitutional catch–22. The Court noted that the NFA's registration provisions at the time were "directed principally at those persons who have obtained possession of a firearm without complying with the Act's other requirements, and who therefore are immediately threatened by criminal prosecutions . . . ." 390 U.S. at 96, 88 S.Ct. at 730. If possessors of illegal guns registered their firearms, then, they risked criminal prosecution for their prior unlawful possession; if they did not register, they faced criminal charges under another provision of the NFA which made it an offense to keep unregistered firearms. The Court held this to be an untenable situation given the Fifth Amendment:

> We hold that a proper claim of the constitutional privilege against self-incrimination provides a full defense to prosecution under either a failure to register a firearm . . . or for possession of an unregistered firearm. . . .

390 U.S. at 100, 88 S.Ct. at 732.

Congress responded to *Haynes* by including various amendments to the NFA, including § 5848, in the 1968 GCA. Congress' intent is clear from the following excerpt of the GCA's legislative history:

> In *Haynes v. United States* [citation omitted], the Supreme Court held the registration requirement of existing law constitutionally unenforceable because it required registration almost exclusively by those in illegal possession of a weapon and made this information available to prosecute them for illegal possession. The Senate amendment avoids this problem by extending the registration obligation to all pos-

sessors of weapons—legitimate or otherwise—and *by providing that registration information may not be used directly or indirectly to prosecute a natural person for an offense prior to or concurrent with his registration.*

H.R.Conf.Rep. No. 1956, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.C.C.A.N. 4426, 4435 (emphasis added).

In *Freed v. United States,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971), the Supreme Court upheld the revisions to the NFA as consistent with the Self–Incrimination Clause. Justice Douglas, writing for the Court, stated:

At the time of *Haynes* "only weapons used principally by persons engaged in unlawful activities would be subjected to taxation." ... Under the Act, as amended, all possessors of firearms as defined in the Act are covered....

At the time of *Haynes* any possessor of a weapon included in the Act was compelled to disclose the fact of his possession by registration at any time he had acquired possession, a provision which we held meant that a possessor must furnish potentially incriminating information which the Federal Government made available to state, local, and other federal officials....

Under the present Act, only possessors who lawfully make, manufacture, or import firearms can and must register them; **the transferee does not and cannot register.** It is, however unlawful for any person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record."

At the time of *Haynes,* as already noted, there was a provision for sharing the registration and transfer information with other law enforcement officials.... The revised statute explicitly states that no information or evidence provided in compliance with the registration and/or transfer provisions of the Act can be used, directly or indirectly, as evidence against the registrant or applicant "in a criminal proceeding with respect to a violation of law occurring prior to or concurrent with the filing of the application or registration, or the compil-

ing of the records containing the information or evidence."

401 U.S. at 603–04, 91 S.Ct. at 1115 (footnotes with citations omitted) (emphasis in bold in original; underlining emphasis added).

After reviewing these changes, the Supreme Court found no self-incrimination problems:

The transferor—not the transferee—makes any incriminating statements. True, the transferee, if he wants the firearm, must cooperate to the extent of supplying fingerprints and a photograph. But the information he supplies makes him the lawful, not the unlawful possessor of the firearm. Indeed, the only transferees who may lawfully receive a firearm are those who have not committed crimes in the past. The argument, however, is that furnishing the photograph and fingerprints will incriminate the transferee in the future. But the claimant is not confronted by "substantial and 'real'" but merely "trifling and imaginary, hazards of incrimination"—*first* by reason of the statutory barrier against use in a prosecution for prior or concurrent offenses, and *second* by reason of the unavailability of the registration data, as a matter of administration, to local, state and other federal agencies.... Since the states and other federal agencies never see the information, he is left in the same position as if he had not given it, but "had claimed his privilege in the absence of a * * * grant of immunity." ... This, combined with the protection against use to prove prior or concurrent offenses, satisfies the Fifth Amendment requirements respecting self-incrimination.

401 U.S. at 606, 91 S.Ct. at 1116–17 (citations omitted) (emphasis in original).

Neither *Haynes* and *Freed,* nor any case interpreting § 5848 that the parties or this Court have found, give any guidance as to whether § 5848 bars the Government from using the registrations and bound book notations made by Defendants in the instant prosecutions. However, a review of the plain language of the statute and the allegations of the indictments leads this Court to reject the Defendants' arguments that the Govern-

ment's investigation—and any subsequent use of the information thereby gathered—violate § 5848.

As an initial matter, the Court notes that § 5848(a) bars the use of such records *as evidence.* The Court reads this provision to prohibit the introduction of protected records in a trial; it does not appear to proscribe the Government's utilization of the records so far in this case in order to investigate and indict Defendants.

 Furthermore, and more pointedly, should the Government wish to use the records as evidence in trial, the Court believes that the "future crimes" and "furnishing false information" exceptions in § 5848 permit it to do so. A step-by-step review of each of the registrations and recordkeeping events set out in the indictments supports the Court's conclusion.

In Case No. 92–80769, the indictment alleges that Daniel Hunter registered seventy-five .45 caliber machineguns, serial numbers HM 001–HM 075, on May 5, 1986. This act of registration, while legal and protected in and of itself, set in motion the *subsequent* allegedly illegal acts charged in the indictment. Therefore, these registrations can be used against Defendants because § 5848 prohibits the use of such information only with respect to "a violation of law occurring prior to or concurrently with the filing of the application or registration. . . ." Indeed, the Supreme Court has stressed the backward looking nature of self-incrimination analysis:

> Appellees' argument assumes the existence of a periphery of the Self–Incrimination Clause which protects a person against incrimination not only against past or present transgressions but which supplies insulation for a career of crime about to be launched. We cannot give the Self–Incrimination Clause such an expansive interpretation.

*Freed,* 401 U.S. at 606–07, 91 S.Ct. at 1117.

It has been said that the Fifth Amendment is a "shield" and not a "sword." *United States v. Hasting,* 461 U.S. 499, 515, 103 S.Ct. 1974, 1984, 76 L.Ed.2d 96 (1983) (Stevens, J., concurring); *United States v. Rylander,* 460 U.S. 752, 757–59, 103 S.Ct. 1548, 1553, 75 L.Ed.2d 521 (1983). As the Supreme Court indicated in *Freed, supra,* to permit Defendants' argument to hold sway would be to invite the offensive use of the Fifth Amendment privilege against self-incrimination, as embodied in I.R.C. § 5848, to protect future criminal conduct.

The next recordkeeping event in 92–80769 occurred when Daniel Hunter applied to transfer four machinegun receivers bearing serial numbers HM 066–HM · 069 to Gary Rasmussen. Similarly, on October 4, 11 and 13, 1987, Hunter entered the four transfers into his bound book. For his part, Rasmussen recorded receipt of the receivers and then filed forms to transfer them to Bruce Clark. According to the indictment, however, Delwin Wirth transferred the receivers directly to Clark; Hunter and Rasmussen never saw the guns and merely provided the paper cover for the transaction. Thus, all of Hunter's recording was completely false and can be used against him by the Government under § 5848(b).

Finally with respect to 92–80769, on December 12, 1987, Bruce Clark recorded the receipt of four machinegun receivers manufactured by Hunter's Broadhead Armory. This recording also was false according to the indictment. Not only did the receivers fail to originate with Hunter; the indictment alleges that Clark knew that the guns were from elsewhere and agreed with Wirth to have them marked with the Broadhead Armory registration numbers.

All of the records on which the indictment hinges, then, will be used either to show (1) subsequent criminality or (2) the furnishing of false information which allegedly furthered the charged conspiracy to make illegal firearm transactions. The Court therefore finds that § 5848 permits the Government to use these registrations and records in proving its case.

Turning to 92–80770, the Court finds that, according to the indictment, all of the registrations and record entries made by Defendants were false when made. In the first place, the May 7, 1986 registrations made by Daniel Hunter were untrue. On that day, Hunter filed forms with ATF stating that he

had manufactured 461 machinegun conversion kits. The indictment, however, alleges that Hunter did not make these kits but rather that they were acquired by George Dodson, an allegedly unlicensed gun dealer. Similarly, on May 28, 1987, Hunter filed forms requesting the right to transfer twenty conversion kits to John Stemple; Dodson again, however, was the true transferor of the kits. On August 31, 1987, Stemple made false entries in his bound books when he stated that he had received the conversion kits from Hunter rather than Dodson. Stemple also filed false transfer forms to ship the conversion kits to Robert Landies; the forms were false in that they defined the conversion kits as .50 caliber machinegun conversion kits when they allegedly were only .30 caliber conversion kits. Lastly, Landies' notation of receipt of twenty .50 caliber machineguns from Stemple on September 18, 1987 was also inaccurate. What was found in his possession on December 7, 1989, were not .50 caliber machinegun conversion kits but .30 caliber conversion kits.[14] All of these entries and forms were, therefore, false when made. The Government alleges that these recordkeeping events furthered the conspiracy to circumvent federal firearms laws by providing cover to Dodson's illegal introduction of new firearms into the interstate market for these weapons. Just as in part of 92–80769, then, the Court believes that they fall within § 5848(b)'s exception for "furnishing false information."

Defendants' motion to dismiss the indictments and quash the fruits of the Government's investigation under § 5848 is therefore rejected. Trial will proceed as to all Defendants under both indictments.

## C. OTHER MATTERS.[15]

### 1. Defendants' Motion To Dismiss For Failure To State An Offense.

■■ Defendants also argue that Indictment No. 92–80769 Count 1, ¶ 18 and Indictment No. 92–80770 Count 1, ¶ 16, which allege that Defendants Hunter, Clark, Stemple and Landies "willfully and unlawfully ma[de] false entries in records required to be maintained pursuant to regulations proscribed by the Secretary," fail to state an offense against the United States. Specifically, Defendants complain that the indictments do not list the Treasury regulations on which the alleged crimes rely. See Fed.R.Crim.P. 7(c)(1) ("The indictment or information shall state for each count the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated.").

The Court holds that these counts should not be dismissed because the Government can charge Defendants for falsifying their own records in violation of § 923(g)(1)(A). That section states:

> Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Secretary may by regulations prescribe....

Although the indictments do not state the specific regulations on which the Government relies, it can easily remedy the problem by providing a bill of particulars to Defendants with this information.[16] The Government is hereby ordered to do just that.

---

**14.** Defendants Stemple and Landies argue that the only discrepancy in the forms and recordings of this final transfer and receipt was the caliber of the machinegun conversion kits. They argue further that such discrepancy is not material. On this record, however, the Court is not prepared to say whether or not the discrepancy was material. This matter will have to be resolved at trial.

**15.** At the hearing, the Court, for reasons stated on the record, denied Defendant Clark's motion to conduct a hearing on the admissibility of extrajudicial hearsay statements attributed to alleged co-conspirators and to determine the existence of a conspiracy. The Court will conditionally admit co-conspirators' statements at trial subject to eventual proof that a conspiracy existed.

**16.** The cases Defendants cite in support of dismissing the indictment because it does not specify regulations are easily distinguishable. *Russell v. United States*, 369 U.S. 749, 763–65, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962) held that an indictment was inadequate for failing to state sufficient *facts*, not law. Similarly, *United States v. Williams*, 962 F.2d 1218, 1225–26 (6th Cir. 1992), *cert. denied,* — U.S. ——, 113 S.Ct. 264, 121 L.Ed.2d 194 (1992) holds only that a prose-

The Court notes that the indictments did, however, fail to rely on the proper penalty provision in making their charges of falsification of dealer records against Hunter, Clark, Stemple, and Landies. The penalty provision the Government invokes in its indictments for failure to keep proper records is § 924(a)(1)(D) (emphasis added): *"Except as otherwise provided in paragraph ... [924(a) ](3) ...* whoever—(D) willfully violates any other provision of this chapter, shall be fined not more than $5,000, imprisoned not more than five years, or both." The proper penalty for licensed gun dealers like the Defendants, however, is found in § 924(a)(3), which states: "Any licensed dealer, licensed importer, licensed manufacturer, or licensed collector who knowingly ... violates subsection (m) of section 922, shall be fined not more than $1,000, imprisoned not more than one year, or both." Section 922(m), in turn, reads:

> It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector knowingly to make any false entry in, to fail to make appropriate entry in, or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder.

Thus, the Government can charge the four Defendants who kept their own records—Hunter, Clark, Stemple and Landies—only with a misdemeanor for falsifying these records. *See United States v. Percival,* 727 F.Supp. 1015, 1019 (E.D.Va.1990) (imposing misdemeanor rather than felony penalty of § 924(a) upon a licensed firearm dealer), *aff'd* 932 F.2d 964 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 330, 116 L.Ed.2d 270 (1991).

Even though the Government failed to cite the proper penalty section for falsifying gun dealer records, the Court will permit it to amend the indictment to make the correction. *See* Fed.R.Crim.P. 7(c); *United States v. Clark,* 416 F.2d 63, 64 (9th Cir.1969) (Fed.R.Crim.P. 7 allows the government to amend citation to statute in indictment when

facts alleged in the indictment support such a change).

### 2. *Defendant Lomont's Motion For Severance And Change Of Venue.*

Defendant Lomont moves this Court to sever the conspiracy charge against him and to change the venue of his case to Ohio or Kentucky. He reminds the Court that the extent of his involvement in 92–80769 was the suggestion to Wirth that the latter discuss getting registrations for his receivers from Hunter. Such speech, he argues, is protected by the First Amendment. Furthermore, Lomont alleges that the evidence will show that Hunter was an informant for the Government and that ATF allowed him to make phony registrations which he, in turn, offered for sale to "an unsuspecting group of licensed dealers and other purchasers." Lomont's Brief, p. 4.

The Government counterargues first that the First Amendment does not protect speech in furtherance of a conspiracy to violate federal firearms statutes. Second, the Government asserts that Hunter's status as an ATF informant has no bearing on this case. The Government therefore argues that Lomont has made no showing of prejudice warranting severance or a change of venue.

Lomont's reply asserts that the Government cooperated with Hunter in 1986 to register the 1700 scrap metal parts as machineguns in order to promote the crimes in these indictments. Lomont argues that tying his case to a Government informant that masterminded the crimes alleged in these indictments is undue prejudice.

Severance is a matter within the trial court's sound discretion. *United States v. Moreno,* 933 F.2d 362, 369 (6th Cir.1991), *cert. denied sub nom. Morris v. United States,* —— U.S. ——, 112 S.Ct. 265, 116 L.Ed.2d 218 (1991). *Moreno* noted that "[a]s a general rule, persons jointly indicted should be tried together.... Without a showing of compelling prejudice, a motion for severance should not be granted." 933 F.2d at 369.

---

cutor cannot *amend* an indictment. The case does not state that the government cannot *clarify*

which regulations are referenced in the indictment through a device like a bill of particulars.

■ The Court does not believe that Lomont will be unduly prejudiced by standing trial with his alleged co-conspirators. As noted by the Government, the First Amendment does not protect speech made allegedly in furtherance of a firearms crime. Similarly, a thorough *in camera* review of the ATF files on Daniel Hunter indicates that he provided no information to the Government with respect to this investigation. There is also no evidence yet of record that ATF in any way conspired with Hunter to provide him phony registrations that he could then use to trap unwary gun dealers. The fact that Hunter stands accused in both indictments in this case further undermines any argument of his collusion with the Government.

On the record before the Court, then, it cannot grant Lomont's motion for severance. He will stand trial with his alleged co-conspirators here in Michigan.

### 3. *Defendant Lomont's Motion For Dismissal Of The Indictment For Prejudicial Errors.*

Defendant Lomont moves the Court to dismiss his indictment because of alleged inconsistencies between grand jury testimony by Agent Tim Sullivan and an affidavit by witness Delwin Wirth. Such inconsistencies, Lomont contends, prejudiced the grand jury to the extent it improperly returned an indictment against him.

After reviewing the record, the Court finds no inconsistencies. Wirth stated that he met with Lomont in April, 1987, at a machinegun shoot at Nob Creek, Kentucky. He further testified:

I mentioned to Kent Lomont that I had M–60 [machinegun] parts which could be assembled into M–60 machinegun receivers, but that I did not know how I could make the M-60 receivers legally because of the change in the federal machinegun laws. Kent Lomont told me that Daniel Hunter had "papers" for M–60s. By "papers" I understood Kent Lomont to mean ATF-approved registration forms for M–60 machinegun receivers.

Wirth Affidavit, p. 2. Agent Sullivan said the following before the grand jury:

When [Wirth] was down [in Kentucky], what he did indicate ... [was] that he was talking to some individuals down there, including John Stemple and Kent Lomont.

Specifically, with Kent Lomont, he indicated that he had what he called, I believe it was, some iron that he needed registrations or paper for. And Lomont directed him, he said, "The person you want to see is Daniel Hunter, doing business as the Broadhead Armory."

Grand Jury Transcript, vol. 5, p. 8.

Sullivan and Wirth's statements seem to this Court consistent. They furthermore indicate that Lomont was aware of, and directing people to, Mr. Hunter's allegedly illegal paper.

In *Bank of Nova Scotia v. United States,* 487 U.S. 250, 253–55, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988), the U.S. Supreme Court held that "as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudice the defendants." In defining prejudice for alleged prosecutorial misconduct and other grand jury irregularities, the Supreme Court added "dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from substantial influence of such violations." 487 U.S. at 255–57, 108 S.Ct. at 2374 (citation omitted).

Here the Court does not see that there was any misrepresentation of evidence by Agent Sullivan. Because there was no error, there is no prejudice to Defendant Lomont. His motion is denied.

### 4. *Defendants Hunter And Landies' Motion To Dismiss Indictment No. 92–80770 Because § 922(o) Is Not Constitutional As Applied And Because of Government Misconduct.*

#### a. Section 922(o) as applied.

■ Defendant Hunter and Landies assert that § 922(o) cannot be constitutionally applied to licensed gun dealers. Their argument is essentially this: ATF approved the registrations and transfers in 92–80770 and,

therefore, these acts fall within the exception found in § 922(*o*)(2)(A): "This subsection does not apply with respect to—(A) ... possession [of machineguns] by or under the authority of the United States...."

Defendants argument has no merit. The Government has alleged that Defendants defrauded ATF with their records and registrations in furtherance of their conspiracy to deal in Dodson's illegal machinegun conversion kits. Defendants simply cannot be allowed to defraud ATF with phony applications and records and then use the ill- or under-informed approvals of registrations and transfers by that agency as a shield against criminal prosecution.

### b. Machinegun conversion kits are firearms under Title 18.

■ Defendants Hunter and Landies also contend that while conversion kits are machineguns, they are not firearms under Title 18. The Court finds this argument simply incomprehensible. 18 U.S.C. § 921(a)(3) defines "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive ..." 18 U.S.C. § 921(a)(23) states: "The term 'machinegun' has the meaning given such term in [I.R.C.] § 5845(b) of the National Firearms Act." Finally, I.R.C. § 5845(b) (emphasis added) reads:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun,* and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

From these statutes, the Court concludes that § 921(a)(3) (definition of firearm) incorporates § 921(a)(23) (definition of machinegun) which, in turn, incorporates § 5845(b) (definition of machinegun in NFA, which includes conversion kits). The Court does not see how else one could read these provisions. If Defendants believe that conversion kits are not in and of themselves "weapons" under § 921(a)(3), they forget that that section clearly envisions machineguns as weapons. And, § 921 further defines "machinegun" with reference to § 5845(b), which includes conversion kits. Therefore, reading the statutes together it is indisputable that conversion kits are machineguns under Title 18.

### c. The Government and Agent Sullivan did not engage in any misconduct during the grand jury proceedings.

■ Defendants Hunter and Landies finally argue that the Government prejudiced the grand jury against them, thus warranting a dismissal of the indictment. Defendants point to a number of incidents:

* The prosecutor, Assistant U.S. Attorney Diane Donohue, stated that ATF had jurisdiction over arson cases.

* When a juror expressed concern about safety because this was a gun case, Donohue told the grand jurors that they would have safety in anonymity.

* ATF Agent Tim Sullivan explained that the agency was the result of government efforts to crack down on gangsters in the Prohibition Era.

* When asked by a grand juror if an automatic or semi-automatic weapon was used to kill people in Texas shortly before the grand jury was impanelled, Sullivan responded "Yes, it was." In tracking the history of ATF, Sullivan also made reference to the assassinations of John and Robert Kennedy and Martin Luther King, and the use of explosives in political unrest in the 1970s.

* Sullivan referred to the Explosives Control Act and to the fact that the NFA covered silencers and destructive devices as well as machineguns, all of which "are considered ... inherently dangerous."

* AUSA Donohue incorrectly informed the grand jury that the possession of machineguns after 1986 was illegal when § 922(*o*) did not go that far.

* Agent Sullivan told the grand jury that Michigan bars the possession of ma-

chineguns even though this law has no effect on federally licensed dealers or out-of-state defendants.

* Sullivan testified that there had been an unspecified increase in the use of converted machineguns in Detroit-area crime, even though the Director of ATF has testified to Congress that he did not know of any cases of registered machineguns being used in crimes.

* Sullivan expounded upon all the different kinds of weapons regulated by state and federal law, including, e.g., silencers, pen guns, aerial bombs and even tanks.

* When asked by a grand juror what a person would use a machinegun for in this country, Sullivan responded that ATF had to permit such guns because of the law and the gun lobby, and he also went on to describe the immense firepower of some machineguns.

* In describing how he conducted his investigation, Sullivan stated:

[A]s opposed to going the subpoena route, I went the search warrant route, primarily because these individuals knew they were under investigation and a subpoena basically consists of some sort of good faith on the part of the individual you are dealing with. If you know that you are under investigation, the government gives you a subpoena saying, "We would like for you to give us these records," chances are probably real good that between the time that they get the subpoena and the time that you might get the records, there is going to be a fire, flood, theft.

* Finally, AUSA Donohue apologized to the grand jury for not being able to "spice up" her presentation of the paper filings relevant to the case. She also explained to the grand jury how a conspiracy count and substantive counts are different by using an arson example.

Defendants argue that these statements destroyed the grand jury's ability to independently evaluate probable cause for an indictment, and they ask this Court to dismiss the Indictment No. 92–80770 as a result. Their brief cites a number of cases in which statements similar to the ones above were held to prejudice defendants before petit juries. *See United States v. Norton,* 639 F.2d 427, 429 (8th Cir.1981) (prosecutor's closing argument about the purpose of the GCA to regulate the dangerous nature of sawed-off shotguns was improper; conviction reversed); *United States v. Fullmer,* 457 F.2d 447, 449 (7th Cir.1972) (prosecutor's statements that GCA was passed to provide support for local law enforcement efforts against crime and that the jury knew about the use of guns for sniping and causing disturbances was sufficient error to reverse the conviction). *Cf. United States v. Bell,* 573 F.2d 1040, 1045 (8th Cir.1978) (permitting ATF agent's testimony about the danger of sawed-off shotguns was error, although harmless).

The Government responds that the prosecutor and agent acted properly before the grand jury. AUSA Donohue and Agent Sullivan merely answered juror questions as they arose and sketched for the grand jury how ATF operates.

 The Court does not find any evidence of prosecutorial misconduct. The Sixth Circuit standard for dismissing indictments because of prosecutorial misconduct before a grand jury is a difficult one for Defendants to meet:

The [defendants] must demonstrate that "prosecutorial misconduct is a long-standing or common problem in grand jury proceedings in the district." ... In addition to showing long-standing misconduct, "a defendant who seeks dismissal of an indictment ... must show he was prejudiced by the prosecutor's actions" before the grand jury.

*United States v. Azad,* 809 F.2d 291, 294 (6th Cir.1986) (holding no prosecutorial misconduct when prosecutor previewed testimony for the grand jury and noted that some of the witnesses were targets of the investigation), *cert. denied sub nom. Bigley v. United States,* 481 U.S. 1004, 107 S.Ct. 1626, 95 L.Ed.2d 200 (1987).

Here there is no evidence of longstanding prosecutorial misconduct, nor have Defendants shown that they were prejudiced by AUSA Donohue's statements to the grand jury. The Court's review of the record

shows AUSA Donohue's challenged comments were innocuous, with the possible exception of her statement that the 1986 Act banned the possession of machineguns. *See* Grand Jury Transcript, vol. 1, p. 12. However, any confusion this statement may have caused was cured by Agent Sullivan's testimony on that same day:

> One thing I want to make clear right from the outset is that there are legal [ ] firearms. There are legal conversion kits, there are legal machineguns, legal submachineguns, silencers and destructive devices, as long as they are registered and as long as they are properly registered.

Grand Jury Transcript, vol. 2, pp. 10–11.

Turning now to Agent Sullivan's testimony, even though he did on numerous occasions refer to historical events and to weapons other than machineguns, his statements were in the context of explaining to the grand jury what ATF does, not what Defendants allegedly did. Similarly, his comments on why search warrants were used instead of subpoenas does not refer to Defendants specifically, but rather to general ATF strategy and experience.

In *United States v. Edmonson*, 962 F.2d 1535 (10th Cir.1992), the court considered whether comments by a government agent on the stand before the grand jury were sufficiently prejudicial to warrant dismissing the indictment. The defendant faced drug-trafficking charges, and the agent testified that the defendant refused to answer questions after he received his *Miranda* warnings. 962 F.2d at 1539. The agent also speculated about the origin and the purity of drugs found with the defendant. 962 F.2d at 1539. Lastly, the agent recounted for the grand jury a conversation he had with a co-defendant about a third person who had died from bad cocaine. 962 F.2d at 1539.

In weighing the agent's comments as well as additional allegations of prosecutorial misconduct, *Edmonson* noted that "[the] 'presumption of regularity' given to all grand jury proceedings is a difficult burden to overcome and requires very significant misconduct on the part of the prosecutor or other government agents." 962 F.2d at 1539. The court went on to conclude that the alleged

misconduct simply was insufficient to prejudice the defendant; even absent those comments, the court still believed that the grand jury would have come back with the indictment. 962 F.2d at 1539.

The Court holds that the same analysis applies to this case. Agent Sullivan's comments were less prejudicial than the agent's statements in *Edmonson* in that none of them directly impugned Defendants. Viewing the grand jury proceedings as a whole, then, there was insufficient prejudice to warrant dismissing the indictments because of either prosecutorial or agent misconduct.

## IV. CONCLUSION

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' motions are DENIED.

IT IS FURTHER ORDERED that the Government shall provide to Defendants Hunter, Clark, Stemple and Landies a bill of particulars as set forth in this Opinion and Order.