**UNITED STATES of America, Plaintiff,**

**v.**

**D–1 Daniel HUNTER, D–2 John Stemple, D–3 Robert Landies, D–4 George Dodson, Defendants.**

**No. 92–CR–80770–DT.**

United States District Court, E.D. Michigan, Southern Division.

Sept. 2, 1994.

Diane Donohue, Asst. U.S. Atty., Detroit, MI, for plaintiff.

Richard O'Neil, FDO Detroit, MI, for Hunter.

Robert Sanders, Washington, DC, for Stemple.

James Jeffries, Greensboro, NC, for Landies.

Ed Wishnow, Southfield, MI, for Dodson.

*OPINION AND ORDER REGARDING DEFENDANT STEMPLE'S MOTION TO QUASH SEARCH WARRANT, SUPPRESS EVIDENCE AND DISMISS INDICTMENT, MOTION TO SEVER, AND MOTION FOR BILL OF PARTICULARS; DEFENDANT LANDIES' MOTION FOR RECONSIDERATION; AND DEFENDANT DODSON'S MOTION FOR DISCOVERY*

ROSEN, District Judge.

## I. INTRODUCTION

On January 24, 1994, this Court issued an opinion and order resolving a series of pretrial motions filed by Defendants Hunter, Landies and Dodson and by defendants in a companion case. *See United States v. Hunter*, 843 F.Supp. 235 (E.D.Mich.1994) (herein-

after *Hunter I* ). Before proceeding to trial, however, this Court must decide a second round of pretrial motions brought with this Court's permission by Defendant Stemple on January 18. They are (1) Stemple's motion to quash a search warrant, suppress evidence, and dismiss indictment; and (2) Stemple's motion for severance.[1]

Defendant Landies also moved this Court on February 25 to reconsider its holding in *Hunter I* that machinegun conversion kits are "firearms" for purposes of Title 18 of the United States Code. *See* 843 F.Supp. at 256.

## II. DISCUSSION

### A. SUMMARY OF THE INDICTMENT.

#### 1. Count I: Conspiracy To Violate Federal Firearms Laws In Violation Of 18 U.S.C. § 371.[2]

Prior to 1986, George Dodson, who was neither a federally licensed firearms manufacturer nor a licensed dealer, arranged for the manufacture and/or acquisition of M–2, M–10, and M–11 .30 caliber machinegun conversion kits.[3] Dodson lived and/or worked at all times relevant to the indictment in Dearborn, Michigan.

Before May, 1986, Dodson agreed to transfer the conversion kits to Daniel Hunter, a licensed firearm manufacturer in the Eastern District of Michigan d/b/a the Broadhead Armory, Inc. Hunter, in turn, filed registration forms with the U.S. Department of Treasury's Bureau of Alcohol, Tobacco and Firearms ("ATF") on May 7, 1986, showing that the Broadhead Armory manufactured the conversion kits.[4]

On May 28, 1987, Hunter signed and forwarded twenty ATF Form 3s (Application for Tax–Exempt Transfer of Firearm and Registration to Special (Occupational) Taxpayer) requesting permission to transfer twenty M–1 and M–2 .30 caliber carbine conversion kits with serial numbers BAV 082–BAV 101 to John Stemple, a federally licensed firearms manufacturer in Ohio. On August 31, 1987, Stemple made an entry in his bound book showing receipt of the twenty conversion kits listed above from Hunter, even though he allegedly received the weapons directly from Dodson. On September 2, 1987, Stemple filed and forwarded ATF Form 3s requesting permission to transfer the above twenty conversion kits to Robert Landies, a federally licensed firearms manufacturer in Ohio d/b/a the Collector's Corner. The Form 3s showed the conversion kits as being .50 caliber machineguns. On September 18, 1987, Landies made an entry in his bound book showing receipt of twenty ".50 caliber full auto[s]."

On December 7, 1989, Landies still had in his possession the twenty .30 caliber conversion kits with serial numbers BAV 082–BAV 101. On December 14, 1987, Hunter had in his possession 328 conversion kits manufactured by Dodson but registered as being manufactured by himself. Similarly, on March 8, 1988, Stemple had in his possession some 75 conversion kits manufactured by Dodson but registered as being manufac-

---

1. Stemple also moved for a bill of particulars, which this Court had already ordered to be provided to all Defendants in *Hunter I*. *See* 843 F.Supp. at 253, 258. In addition, Defendant Dodson moved this Court to order certain discovery on March 17, 1994. This matter was resolved by the parties at the hearing on Stemple's motions.

2. 18 U.S.C. § 371 reads: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

3. The parties agree that machinegun conversion kits are one or multiple-piece instruments which convert a semiautomatic firearm into a fully automatic firearm. In other words, a machinegun conversion kit alters a firearm in which one has to pull the trigger each time a bullet is discharged into a firearm which will empty the attached cartridge of bullets with a single, constant pull of the trigger.

4. Specifically, Hunter filed 44 ATF Form 2s (Notice of Firearms Manufactured or Imported) showing the manufacture of 461 conversion kits (101 M–2 carbine conversion kits with serial numbers BAV 001–BAV 101; 34 M–10 one-piece conversion kits with serial numbers BAL 001–BAL 034; and 326 M–11 one-piece conversion kits with serial numbers BAM 001–BAM 326).

tured by Hunter. On July 10, 1989, Hunter had in his possession 299 conversion kits he received from Dodson but listed as being manufactured by himself. And, on March 21, 1990, Stemple had in his possession 87 conversion kits which he received from Dodson, but which were registered as being manufactured by Hunter.

The indictment alleges that all of these acts violated 18 U.S.C. § 371. In particular, the indictment alleges that the Defendants knowingly conspired to violate 18 U.S.C. §§ 922(a)(1)(A)[5], 992(o)[6], 923(g)(1)(A),[7] 924(a)(2)[8] and 924(a)(3).[9]

### 2. *Count II: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Landies).*

On or about December 7, 1989, Landies knowingly possessed twenty machinegun conversion kits with serial numbers BAV 082–BAV 101 in violation of § 922(o).

### 3. *Count III: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Hunter).*

On or about December 14, 1987, Hunter knowingly possessed 328 machinegun conversion kits in violation of § 922(o).

### 4. *Count IV: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Stemple).*

On or about March 8, 1988, Stemple knowingly possessed 75 machinegun conversion kits in violation of § 922(o).

### 5. *Count V: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Hunter).*

On or about July 10, 1989, Hunter knowingly possessed 299 machinegun conversion kits in violation of § 922(o).

### 6. *Count VI: Possession Of Machineguns In Violation Of 18 U.S.C. § 922(o) (Stemple).*

On or about March 21, 1990, Stemple knowingly possessed 87 machinegun conversion kits in violation of § 922(o).

### 7. *Count VII: False Or Fraudulent Statements In Violation Of 18 U.S.C. § 1001 (Stemple).*[10]

On September 2, 1987, Stemple knowingly filed false ATF Form 3s to transfer machine-

---

5. Section 922(a)(1)(A) reads: "It shall be unlawful for any person except a licensed importer, licensed manufacturer, or licensed dealer to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce...."

6. Section 922(o) reads:
(1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
(2) This subsection does not apply with respect to—
 (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency or political subdivision thereof; or
 (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

7. Section 923(g)(1)(A) reads: "Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business for such period, and in such form, as the Secretary may by regulations prescribe...."

8. Section 924(a)(2) reads: "Whoever knowingly violates subsection ... (o) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both."

9. Section 924(a)(3) states: "Any licensed dealer, licensed importer, licensed manufacturer, or licensed collector who knowingly ... violates subsection (m) of section 922, shall be fined not more than $1,000, imprisoned not more than one year, or both." Section 922(m), in turn, reads:

It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector knowingly to make any false entry in, to fail to make appropriate entry in, or to fail to properly maintain, any record which he is required to keep pursuant to section 923 of this chapter or regulations promulgated thereunder.

10. Section 1001 reads: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false,

gun conversion kits to Landies in violation of 18 U.S.C. § 1001.

### 8. *Count VIII: Engaging In The Business Of Firearms Without A License In Violation Of 18 U.S.C. §§ 922(a)(1)(A) And (a)(2) (Hunter, Stemple, Dodson).*[11]

From on or about September, 1987, through March, 1990, Hunter, Stemple and Dodson willfully engaged in firearms dealing without a license in violation of §§ 922(a)(1)(A) and 922(a)(2).

## B. *STEMPLE'S MOTION TO QUASH SEARCH WARRANT, SUPPRESS EVIDENCE AND QUASH INDICTMENT.*[12]

### 1. *Stemple's Challenges Of Search Warrant And Search Return.*[13]

#### a. The search warrant.

On March 21, 1990, ATF agents searched Stemple's business/home on 6529 Alum Creek Drive in Groveport, Ohio, pursuant to a search warrant issued the day before. The warrant was issued on the grounds that probable cause for a search was shown by ATF Agent Tim Sullivan's affidavit. *See* Stemple's Brief, Ex. IV (hereinafter "Affidavit").

Stemple argues that this affidavit fails to set forth sufficient probable cause for the warrant to issue. Specifically, Stemple asserts that the affidavit fails to establish a nexus between Defendant Hunter's alleged illegalities and Stemple's activities. Instead, Stemple contends that it sets forth a series of complicated facts which could be easily misconstrued. In addition, Stemple argues that the warrant contains false and misleading statements, in that it did not contain the

following pieces of information also known to Agent Sullivan at the time: (1) that Stemple was not under investigation for illegal registration of firearms; (2) that Agent Sullivan did not know for sure if Hunter was transferring actual firearms or, as he suspected, only paper registrations for the same; (3) that Agent Sullivan knew Stemple traded in bulk in firearms; (4) that most of Hunter's machinegun registrations were, in fact, legal; and (5) that a less intrusive form of investigation was available to ATF. Because of the allegedly misleading nature of the Affidavit, Stemple asks either for a suppression of the evidence seized from his business/home, or for a hearing in accord with *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to determine the sufficiency of the Affidavit.

The Government counters that it is Stemple who is attempting to mislead the Court on the sufficiency of Agent Sullivan's Affidavit. It relies on the search warrant affidavit and Agent Sullivan's grand jury testimony in support of its position.

■ The Court has reviewed the search warrant affidavit and the portions of the grand jury transcript cited by Stemple, and it finds that the Government is absolutely correct. The search warrant affidavit clearly establishes the following:

1. On June 2 and 6, 1987, an ATF inspector visited Daniel Hunter's Broadhead Armory and recorded the presence of certain machinegun receivers and conversion kits. Affidavit ¶¶ 10, 10A and 11.

2. Hunter transferred to Stemple many of these receivers and conversion kits, and Stemple himself, in turn, trans-

---

fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned for not more than five years, or both."

**11.** Section 922(a)(1)(A) is quoted *supra,* n. 5. Section 922(a)(2) reads: "It shall be unlawful for any importer, manufacturer, dealer, or collector licensed under the provision of this chapter to ship or transport in interstate or foreign commerce any firearm to any person other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector...."

**12.** Many of the matters raised in this motion were resolved in the Court's opinion in *Hunter I.* This opinion and order will address, therefore, only the new issues presented by Defendant Stemple.

**13.** Although other Defendants have joined this motion, they have not filed the warrants, returns, and affidavits applicable to the searches of their businesses and/or homes.

ferred these items on to others. *See* ¶¶ 12–20.

3. These transfers appeared improper because what was transferred was either not what Hunter had originally registered or was something other than what appeared on the transfer records Hunter and Stemple filed. *See* ¶¶ 16, 21.

4. Hunter, with the probable assistance of Stemple, had engaged in a number of schemes to transfer only the "paper" for firearms, i.e., their valid registrations, and not to additionally transfer the actual firearms. *See* ¶ 23. This was evidenced by the following:

a. The events involving the defendants in 92–80769, a companion case to the instant action. *Id.*

b. The fact that with respect to alleged Broadhead Armory gun transferees, including Stemple, Hunter retained firearms even though the transfer records of Hunter, the alleged transferee, and ATF stated that they had been transferred. *See* ¶¶ 23 & 24.

c. The fact that other "paper only" transfers involving Stemple were possible because what he actually received from Hunter and either kept or transferred elsewhere did not correspond with Hunter's original registrations. *See* ¶ 23.

From all this, Agent Sullivan stated:

Your affiant, through the investigation set forth in this affidavit, has probable cause to believe that ... John Stemple ... received or possessed illegally manufactured firearms and/or received or possessed firearms not registered to [him] in the National Firearms Registration and Transfer Record, or made or caused to be made false entries on applications, returns or records required by law, or conspired to do so in violation of Title 26, U.S.C., Secs. 5861(c), (d), (*l*) and Title 18, U.S.C., Sec. 371.

Affidavit, ¶ 30.

After reviewing the record, the Court believes that there is no doubt that probable cause existed for the search of Stemple's business/home. Indeed, Defendant does not challenge any of the factual statements made above—only that there is an insufficient nexus between Stemple and the alleged criminality. A cursory review of the affidavit, however, clearly establishes probable cause to believe Stemple has violated federal firearms laws.

Nor is the Court persuaded that Agent Sullivan in any way deliberately or recklessly misled the issuing magistrate judge by failing to include the information Stemple claims that he should have included. In terms of its salience to the case, the omitted information pales in comparison to the included information. Indeed, even if it were included, there is no doubt that probable cause would still exist for the issuance of the warrant.

■ The Court has recently examined the issue of when a criminal defendant's challenge to a search warrant affidavit should lead to suppression of the fruits of the subsequent search. *United States v. Turner,* 93–80981, unpublished op. at 4–11 (E.D.Mich. March 30, 1994). In order to receive a hearing on the truthfulness of a search warrant affidavit, a defendant must make "a substantial preliminary showing that a false statement knowingly or intentionally, or with reckless disregard for the truth, was included in the affidavit...." *Franks, supra,* 438 U.S. at 154, 98 S.Ct. at 2676. Here, Stemple has made no showing that Agent Sullivan in any way lied or attempted to mislead the issuing magistrate judge. Thus, Stemple's motion to quash the search warrant or, alternatively, to compel a *Franks* hearing, is denied.

**b. The scope of the search.**

Stemple also urges this Court to order the suppression and return of certain items seized in the search of his business/home, namely all items within 22 of 31 listed categories of seized material. *See* Stemple's Brief, Ex. IV, Return. The Government argues that the search warrant countenanced the seizure of these items. *See id.,* Items Seizable Under Search. The Government does not argue that any of the items were seized pursuant to the exceptions to the warrant requirement, such as the plain view excep-

tion, nor is there any factual record to support such a claim.

■ In terms of firearms, the search warrant limits seizure of evidence to those items falling within the following paragraph:

All of the following items being marked or designated as being manufactured by Daniel Hunter and/or the BROADHEAD ARMORY INC., and bearing such designation as serial numbers beginning with the designation of BA followed by another letter and three digits, as well as BA in any configuration as to serial numbers including:

1. Finished machineguns;

2. Finished and completed submachinegun receivers;

3. Finished and completed machinegun receivers;

4. Unfinished and incomplete fully automatic firearms;

5. Unfinished and incomplete fully automatic firearm receivers;

6. Submachineguns;

7. Conversion kits (to convert semi-automatic firearms into fully automatic firearms);

8. Component parts for submachineguns;

9. Component parts for machineguns;

10. M–60 machinegun component parts including M–60 lower receiver channels;

11. M–60 receivers, complete and incomplete.

See Stemple's Brief, Ex. IV, Items Seizable Under Warrant. The warrant also authorizes the seizure of various correspondence and records, plus "[s]tamps, presses, punches, engraving tools, casting used in the marking and identification of firearms, including both numerical and alphabetical stamps, punches, presses and castings." Id.

Stemple correctly points out that 22 of the 31 items seized in the March 21, 1990 search do not clearly fall within the list of items seizable. See Id., Return, Items 1–4, 6, 9–24, 29. Only items 5, 25–28 and 30–31, which are firearms bearing Broadhead Armory designations, and items 7–8, which are stamp sets, fall within the categories of items seizable under the warrant. The other items are firearms which bear designations other than the Broadhead Armory. Because the seizure of these items was not envisioned by the warrant, and because the Government has offered no factual or legal argument for an alternative basis for their seizure, the Court orders that these items be suppressed.

As for Stemple's request that the Government return any items that may have been suppressed, the Government has represented that such a return would be impossible. Defendant Stemple, then, may want to seek civil relief for the possibly illegal seizure of these items and for the Government's failure to return them. This matter, however, is not before the Court, so it will not pass any judgment on the issue.

### 2. Vagueness Of Count I.

Stemple argues that Count I of the indictment is too vague for four reasons: (1) it does not specify which of two clauses of the conspiracy statute, 18 U.S.C. § 371, is at issue; (2) it does not specify which of the more particular statutes set out in ¶ 16 of Count I's General Allegations that Stemple and the other Defendants each allegedly conspired to violate; [14] (3) it misstates the law in ¶ 19 of the General Allegations section; [15] and

---

14. Paragraph 16 of the indictment charges all the Defendants with conspiring "to unlawfully possess and transfer machineguns, and to willfully and unlawfully make false entries in records required to be maintained pursuant to regulations pr[e]scribed by the Secretary; all in violation of Title 18, United States Code, Sections 922(a)(1)(A), 922(o), 923(g)(1)(A), 924(a)(2) and 924(a)(3)."

15. Paragraph 19 of the indictment states (emphasis added): "It was further part of the conspiracy that JOHN STEMPLE, DANIEL HUNTER, and GEORGE DODSON, defendants herein, would conspire and agree with each other to have GEORGE DODSON, defendant herein, deliver the conversion kits to JOHN STEMPLE, defendant herein, upon which JOHN STEMPLE, defendant herein, would file registration forms with the Secretary showing receipt of the conversion kits from Broadhead Armory."

(4) it does not spell out which regulations are relied upon in ¶ 2 of the General Allegations.

As noted *supra* n. 1, the Court has already ordered that the Government provide a bill of particulars to Defendants to spell out the regulations on which the Government relies in ¶ 2 of Count I's General Allegations. The Court will address each of Stemple's other three arguments below.

With respect to § 371,[16] Stemple is correct that it sets out two different crimes: conspiracy to commit a specific statutory offense against the United States, and conspiracy to more generally defraud the United States. *United States v. Sturman*, 951 F.2d 1466, 1472–73 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2964, 119 L.Ed.2d 586 (1992); *United States v. Minarik*, 875 F.2d 1186, 1186–87 (6th Cir.1989). However, he is incorrect in arguing that the indictment in this case fails to specify which crime is charged.

In *Minarik*, the Sixth Circuit explained how a court can tell which § 371 crime is charged: "The first category requires reference in the indictment to another criminal statute which defines the object of the conspiracy. The second category, the defraud clause, stands on its own without the need to refer to another statute which defines the crime." 875 F.2d at 1187.

In the instant case, the Government clearly listed the specific statutory crimes it believed Defendants conspired to violate in ¶ 16 of the General Allegations of Count I. Thus, the conspiracy count falls under the "specific crimes" prong of § 371, and the Court sees no need for further clarification on this point.

With respect to Stemple's criticism that the indictment fails to properly set forth which of the specific statutory offenses listed in ¶ 16 of the General Allegations section is applicable to each of the Defendants, the Court notes that Stemple's argument boils down to stating that he could not have conspired to violate § 922(a)(1)(A). That statute reads (emphasis added):

It shall be unlawful for any person *except a licensed importer, licensed manufacturer, or licensed dealer* to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce. . . .

Stemple, however, simply misses the point of the charge. The indictment clearly alleges that Stemple and some or all of his Co-Defendants conspired to have Dodson, an unlicensed gun dealer, get his illegal firearms into the stream of commerce. Thus, even though Stemple is a licensed dealer and manufacturer, he can still be charged with conspiring to violate § 922(a)(1)(A), or, in the case of Count VIII of the indictment, with facilitating Dodson's unlicensed firearms dealing.

Finally, Stemple argues that ¶ 19 of the General Allegations of Count I misstates the law when it says (emphasis added): "JOHN STEMPLE, defendant herein, would file *registration* forms with the Secretary [of the Treasury] showing receipt of the [allegedly illegal Dodson] conversion kits from [Hunter's] Broadhead Armory." Stemple is correct that, even according to the indictment, he did not file *registrations* with ATF. However, it is equally clear that the indictment plainly charges him with keeping false records in his bound book and with filing a false transfer form with ATF—both papers showing that the conversion kits that he actually got from Dodson came instead from Hunter. *See* ¶¶ 4–5, Overt Acts of Count I. The Court, therefore, does not believe that a dismissal of the indictment would be appropriate because the use of the word "registration" in Count I's General Allegations, ¶ 19, did not fail to give proper notice to Stemple of the charges that he faces. *See United States v. Holmes*, 975 F.2d 275, 284–85 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1322, 122 L.Ed.2d 708 (1993).

### 3. *Proper Venue.*

Stemple further argues that venue is improper on four of the five charges against him, namely, the conspiracy count (Count I), the two possession counts (Counts IV & VI), and the false filing count (Count VII). Lan-

---

16. For the text of the statute, see *supra* n. 2.

dies has joined in the motion and states that the possession count against him (Count II) is also improperly before the Court (Count II). Stemple and Landies argue that these counts of the indictment should be dismissed for improper venue, though clearly the appropriate remedy should the Court decide that there is improper venue would be to transfer these counts to the appropriate federal district court. *See* Fed.R.Crim.P. 21(b) (permitting a court to transfer venue on motion from a party when such an act would further "the interest[s] of justice"). The Government contends that all counts are properly before this Court.

### a. The conspiracy count.

■■■ With respect to Count I, there is no question that venue is proper here. The Sixth Circuit has recently reaffirmed the long-standing principle that a conspiracy case can be tried in any district in which one of the overt acts of the conspiracy occurred. *See United States v. Turner*, 936 F.2d 221, 226 (6th Cir.1991). The indictment in this case clearly indicates overt acts occurred in the Eastern District of Michigan, so dismissing or transferring this count on the grounds of improper venue would be inappropriate.

### b. The possession counts.

These counts, once again, charge Defendants under 18 U.S.C. § 922(*o*), which states that in general "[i]t shall be unlawful for any person to ... possess a machinegun." 18 U.S.C. § 922(*o*)(1).[17] With respect to the three possession counts, Stemple and Landies argue that these alleged crimes did not take place in the Eastern District of Michigan, but, rather, in Ohio where they received and possessed the conversion kits at all times. The Government argues that because all of the substantive offenses were also overt acts in the conspiracy count, and because the Court clearly has venue over that count, venue over the substantive counts is also proper. The Government cites *Pinkerton v. U.S.*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) in support of this contention.

That famous decision held that a conspirator will be responsible for all substantive crimes committed by any co-conspirator in furtherance of the conspiracy. 328 U.S. at 645–46, 66 S.Ct. at 1183–84.

Fed.R.Crim.P. 18 states:

Except as otherwise permitted by statute or by these rules, the prosecution shall be had in a district in which the offense was committed. The court shall fix the place of trial within the district with due regard to the convenience of the defendant and the witnesses and the prompt administration of justice.

This rule springs from two constitutional provisions. The first is found in Article III, § 2, ¶ 3: "Trial shall be held in the State where said Crimes shall have been committed...." The second is in the Sixth Amendment: "In all criminal prosecutions the accused shall enjoy ... trial, by an impartial jury of the State and district wherein the crime shall have been committed...."

■■■ The Sixth Circuit has held that motions to dismiss or transfer criminal cases because of venue are left to the discretion of the Court. *See Turner, supra*, 936 F.2d at 226. It has also, however, provided to courts in this circuit some guidance on how to handle these motions. In *United States v. Beddow*, 957 F.2d 1330 (6th Cir.1992), the court faced the issue of whether venue in the Western District of Michigan was proper for money laundering charges against the defendant. The defendant in *Beddow* received thousands of dollars in cash in 1986 and 1987 from his drug dealing in the Western District. On April 21, 1988, he gave to one of his accomplices $29,000 to finance an emerald purchasing deal. The accomplice then bought travellers checks at a bank in Troy, Michigan, with some of these funds. At the Troy bank, the accomplice filled out a currency transaction report and an international transportation of currency report. The accomplice and defendant then took the travellers checks on a trip to Brazil to purchase the emeralds. 957 F.2d at 1333.

---

**17.** Although Stemple transferred machinegun conversion kits to Landies, and the unlawful transfer of machineguns is also chargeable under

§ 922(*o*), this transfer is not listed as a substantive count in the indictment.

In determining whether venue was proper in the Western District of Michigan, the Sixth Circuit stated:

> Unless the statute violated prescribes the venue, offenses committed in more than one district "may be inquired of and prosecuted in any district in which such offense was begun, continued or completed." 18 U.S.C. § 3237(a).[18] The government bears the burden of proving by a preponderance of the evidence that venue was proper as to each count.... *This court determines the proper venue by a "substantial contacts rule that takes into account a number of factors—the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate factfinding...."*

957 F.2d at 1335 (emphasis added) (citations omitted).

Defendant in *Beddow* argued first that money laundering was not a continuing offense. The court rejected this argument, stating: "Beddow's argument focuses too narrowly on the act of filing the required [currency transaction report] disclosures without considering that transporting as well as procuring the money illegally are essential elements of money laundering." 957 F.2d at 1335. The court also held that all of the relevant acts constituting money laundering did not occur in the Eastern District of Michigan. It stated:

> In the present case, it is clear that the funds involved in [the] money laundering counts were acquired by selling drugs in the Western District. Also, count 4 involved travel that originated in Traverse City. We conclude that these acts were essential elements of the money laundering offenses and that they were sufficient to confer venue under section 3237(a).... Although venue may have been proper in the Eastern District, venue is not limited to a single district when a crime implicates more than one location.... Under the substantial contacts test used in the Sixth

Circuit, venue was proper in the Western District of Michigan.

957 F.2d at 1336 (citations omitted).

The framework arising from *Beddow*, then, is to first determine on a count-by-count basis if each count in the indictment is one that is a continuous crime. If it is, then venue is proper for that count in any district where the crime alleged therein began, continued, or ended. 18 U.S.C. § 3237(a). In deciding which district should try the case, a court should next apply the factors set out in the opinion.

█ Stemple and Landies concede that the possession of machineguns is a continuous crime. Thus, the first prong of the *Beddow* test is met. Defendants nonetheless argue that their crimes of possession alleged in the indictment did not begin, continue, or end in Michigan. Stemple's Brief, p. 30.

█ After applying the four factors in the *Beddow* opinion to the possession counts, the Court believes that venue is proper as to the possession counts against Stemple but improper as to the possession count against Landies. Thus, the Court will order transfer of venue of Count II to the U.S. District Court for the Southern District of Ohio. *See* Fed.R.Crim.P. 21(b).

With respect to applying the "site of defendant's acts" and the "nature of the crime" contacts set out in *Beddow* to the possession counts against Stemple, the Court believes that while he allegedly had actual possession of the conversion kits only in Ohio, he also allegedly had constructive possession here in Michigan. The Sixth Circuit has stated that "[c]onstructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over the object, either directly or through others." *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir.), *cert. denied*, 414 U.S. 866, 94 S.Ct. 54, 38 L.Ed.2d 85 (1973). Without reading too much into the indictment, it is clear that in order for Stem-

---

**18.** This statute states in full: "Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

ple to have received the conversion kits from Dodson and to have arranged for the "paper" cover for them with Hunter, he must have placed some kind of order with them here in Michigan in writing or by telephone. Once that order was placed and Dodson and Hunter started to arrange for the transfer of the conversion kits and the "paper" cover, Stemple's possession of the kits began. Thus, venue is proper here in Michigan for the possession counts against him. *See, e.g., United States v. Medina,* 992 F.2d 573, 587 (6th Cir.1993) (holding that venue was proper in Michigan for charges of possession with intent to distribute narcotics even though defendants never set foot in the state because that was where the drugs were ultimately distributed to purchasers), *cert. denied sub nom. Wilson v. United States,* —— U.S. ——, 114 S.Ct. 1049, 127 L.Ed.2d 371 (1994); *United States v. Swinney,* 970 F.2d 494, 497 (8th Cir.1992) (holding that venue was proper in Missouri for a narcotics possession count because defendant had constructive possession of the drugs when he kept in telephone contact with a co-conspirator who had actual possession of the drugs in California), *cert. denied,* —— U.S. ——, 113 S.Ct. 1650, 123 L.Ed.2d 271 (1992); *Cf. United States v. Medina–Ramos,* 834 F.2d 874, 877 (10th Cir.1987) ("It follows that the locus of the constructive possession, and hence the locus of a crime committed by constructive possession, cannot be a place where the defendant has never been, personally *or by a person whose acts are attributable to him.*") (emphasis added).

The remaining two contacts in *Beddow,* the "locus of the effects of defendant's conduct" and a comparison of the factfinding abilities of the courts that might hear the case, also favor keeping the possession counts against Stemple here. As noted above, Stemple's possession of the conversion kits began in Michigan, so the impact of that possession was felt here as well as in Ohio. Moreover, the jury in the case tried in this Court will be in a better position to find facts than that in the U.S. District Court for the Southern District of Ohio by virtue of the fact that the bulk of this case will be tried here, and, thus, the entire factual context will be developed and presented in this Court. Therefore, tak-

ing all of the factors in *Beddow* into account, this Court will retain venue over the possession charges against Stemple.

In contrast, the Court believes that it must transfer the possession count against Landies to the U.S. District Court for the Southern District of Ohio. According to the indictment, Landies, unlike Stemple, apparently had no direct contact with Dodson and Hunter. Rather, the indictment indicates that Landies received the conversion kits after placing an order for them with Stemple at Stemple's business/home in the Southern District of Ohio. Thus, Landies' possession of the conversion kits attributed to him in the indictment did not begin in Michigan, but, rather, in the Southern District of Ohio. Similarly, the impact of *his* possession was only felt in Ohio. Finally, with respect to the "factfinding" contact of the *Beddow* test, while this Court has superior factfinding abilities over the Southern District of Ohio, these are not so great as to trump the constitutional guarantee of proper venue for criminal charges. Moreover, the Southern District of Ohio has superior factfinding abilities over the Northern District of Ohio (where Landies would prefer to be tried) because, as will be discussed below, it will also hear the false filing count against Stemple. For these reasons, then, the Court will order the transfer of Count II of the indictment to the U.S. District Court for the Southern District of Ohio.

The Court should add that it sees no merit in the Government's contention that the mere presence of a conspiracy count in an indictment establishes venue as well for all the substantive offenses committed in furtherance of the conspiracy. This argument has been specifically rejected by the only court to have squarely confronted the issue. *See United States v. Jordan,* 846 F.Supp. 895 (D.Nev.1994). In that case, a drug conspiracy was hatched in Nevada, but the relevant substantive offenses were committed in California. The *Jordan* court held that the principle announced in *Pinkerton* was not one that affected venue:

> *Pinkerton* allows co-conspirators to be held criminally responsible for substantive

offenses committed in furtherance of a conspiracy by other co-conspirators. 328 U.S. at 647, 66 S.Ct. at 1183. *Pinkerton* does not affect venue; it only determines the extent of criminal responsibility. Although A may be held responsible for a crime committed by B in Nevada under *Pinkerton,* the crime is still committed in Nevada and, therefore, venue exists in Nevada.

.\* \* \* \* \* \*

Venue exists only in the district(s) where the crime charged was committed. This rule is of constitutional proportions. U.S. Const. amend. VI. There is no exception allowing substantive crimes committed in furtherance of a conspiracy to be prosecuted in any district where venue over the conspiracy itself may be had.

*Jordan,* 846 F.Supp. at 898, 899.

The Court agrees with the reasoning in *Jordan.* The Government should not be allowed to bootstrap venue on the substantive counts to proper venue over the conspiracy count. Venue in criminal cases is a constitutionally protected right, and the Court must do everything in its power to ensure that that right is given full effect. Therefore, while Stemple's motion to transfer venue of the possession counts against him is denied, Landies' motion to transfer venue of the possession count against him is granted to the extent that venue is transferred to the U.S. District Court for the Southern District of Ohio.

#### c. Count VII.

Stemple also argues that this count, which charges him with filing false ATF Form 3s, should be transferred. In addition to suggesting that the situs of the crime was not in Michigan, Stemple urges the Court to hold that the crime of making a false filing is not a continuous one. Thus, according to Stemple, if any crime occurred, it happened in Washington, D.C., where the allegedly false Form 3s were filed with the Director of ATF.

Even assuming the crime is a continuous one, Stemple asserts that the only judicial districts implicated by Count VII are the Southern District of Ohio, where Stemple filled out the forms, and the D.C. District, where they were filed. Venue is, therefore, not established here in the Eastern District of Michigan according to Stemple.

Stemple's argument that Washington, D.C., is the only proper venue for the false statement count relies primarily upon *Travis v. United States,* 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961).[19] In that case, the Court confronted a situation in which a union officer was convicted under 18 U.S.C. § 1001,[20] the same statute under which Stemple is charged. More specifically, the defendant in *Travis* filed a false non-Communist affidavit with the National Labor Relations Board. This affidavit was not mandatory, but it was required if the officer or his union wanted to get an NLRB-sponsored certification election for some plant or office. Section 9(h) incorporated the provisions of 18 U.S.C. § 1001 for punishing false affidavits.

The union officer in *Travis* was tried and convicted in the federal district court for Colorado, the district in which he made out the affidavit. 364 U.S. at 631–32, 81 S.Ct. at 359–60. The government contended in *Travis,* and the lower courts agreed, that venue was proper in Colorado by virtue of 18 U.S.C. § 3237(a), which, it will be recalled, permits prosecution where a continuous crime was begun, continued or completed. *See supra* n. 18. According to the government in *Travis,* this statute permitted it to prosecute the defendant either where he made the affidavit (Colorado) or where it was filed (Washington, D.C.). 81 S.Ct. at 360.

In a rather unique opinion by Justice Douglas, the Supreme Court reversed the conviction for lack of venue. In laying the groundwork for the decision, the Supreme Court seemed to announce a case-by-case analysis of venue problems:

**19.** Stemple also cites another Supreme Court case, *United States v. Lombardo,* 241 U.S. 73, 36 S.Ct. 508, 60 L.Ed. 897 (1916). In that case, the Court held that in a situation involving the failure to file a necessary form, venue is proper only where that form is supposed to be filed. This case is inapposite, because Stemple did file a form.

**20.** This statute is set out in full *supra* n. 10.

Where various duties are imposed, some to be performed at a distant place, others at home, the Court has allowed the prosecution to fix the former as the venue of trial.... The use of agencies of interstate commerce enables Congress to place venue in any district where the particular agency was used.... "The constitutional requirement is as to the locality of the offense, and not the personal presence of the offender." ... Where the language of the Act defining venue has been construed to mean that Congress created a continuing offense, it is held, for venue purposes, to have been committed wherever the wrongdoer roamed.... The decisions are discrete, each looking to the nature of the crime charged. Thus, while use of the mails might be thought to allow venue to be laid either at the sending or receiving end, the trial was recently restricted to the district of the sender, in light of the constitutional provisions already mentioned and the phrasing of the particular criminal statute.... Where Congress is not explicit, "the locus delicti must be determined from the nature of the crime alleged and the location of the act or acts constituting it."

364 U.S. at 633–34, 81 S.Ct. at 360–61 (citations omitted).

The Supreme Court next interpreted the particular statutes before it:

*Section 9(h) of the National Labor Relations Act, with which we are concerned, did not require union officers to file non-Communist affidavits. If it had, the whole process of filing, including the use of the mails, might logically be construed to constitute the offense.* But this statutory design is different. It requires that the Board shall make no investigation nor issue any complaint in the [representation election] matters described in § 9(h) "unless there is on file with the Board" a non-Communist affidavit of each union officer. The filings are conditions precedent to the union's use of the Board's procedures [to get representation elections]....

364 U.S. at 635, 81 S.Ct. at 361 (emphasis added) (footnote and citation omitted). The Supreme Court continued:

The false statement statute, under which the prosecution is brought, penalizes him who knowingly makes any "false" statement "in any manner within the jurisdiction of any department or agency of the United States." There would seem to be no offense, unless petitioner completed the filing in the District of Columbia. The statute demanded the affidavits be on file before it could extend help to the union; the forms prescribed by the Board required the filing in the District of Columbia; the indictment charged that petitioner filed the affidavits there. The words of the Act—"unless there is on file with the Board"—suggest to us that the filing must be completed before there is a "matter within the jurisdiction of the Board within the meaning of the false statement statute. When § 9(h) provides the criminal penalty, it makes the penal provisions applicable to such affidavits," *viz.*, to those "on file with the Board."

364 U.S. at 635, 81 S.Ct. at 361 (footnotes omitted).

*Travis*, then, is a peculiar case. The bizarre statutory structure, and the Supreme Court's inconcealable abhorrence of the McCarthyite provision at issue, gave the Court grounds to say that there was no jurisdiction, and thus no falsehood, until the affidavit was on file. Venue, therefore, was proper only in D.C.

■ Returning to the instant case, the Court believes that the underlined portion of *Travis* quoted above refutes Stemple's argument that his wrongful falsification of ATF Form 3s was not a continuous offense which began when he filled them out and dropped them in the mail in Ohio. Stemple concedes that any time a licensed firearm dealer or manufacturer like himself transfers a machinegun he *must* fill out and file an ATF Form 3. Stemple's Brief, pp. 23–24. Given this mandatory-filing statutory scheme, "the whole process of filing, including the use of the mails, might logically be construed to constitute the offense." *Travis*, 364 U.S. at 635, 81 S.Ct. at 361.

Indeed, such a holding is consistent with the plain language of § 1001. That statute, once again, reads:

> Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

18 U.S.C. § 1001. This language, then, unlike NLRA § 9(h) analyzed in *Travis,* does not require that false statements be on file for the offense to *commence.* Indeed, the statements that Stemple made on the ATF Form 3s were just as false when he made them in Ohio as they were when they were filed in D.C. That the offense may not be *complete* until filed is, under the four corners of *Travis,* no bar to venue where the offense commenced.

The Court draws support for its conclusion that § 1001 is a continuous crime from decisions rendered by the Second and Fifth Circuits. These courts have held that the crime of making false statements in violation of § 1001 occurs both where the statement is made and where it is filed. *See United States v. Mendel,* 746 F.2d 155, 164–65 (2d Cir.1984) (holding that the place where false agricultural documents were made was proper venue), *cert. denied,* 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985); *United States v. Herberman,* 583 F.2d 222, 227 (5th Cir.1978) (holding that the place where false medical payment request documents were filled out, executed, and mailed was the proper venue). Interestingly, in reaching its conclusion, the *Mendel* court narrowly construed *United States v. Travis,* the case on which Stemple relies to say venue is proper only where his ATF Form 3s were filed:

As this court has observed, "the decision [in *Travis* ] surely was meant to be confined to the facts on the unusual statute involved." ... *Travis* merely limits [18 U.S.C. § 3237] in accord with Congress' specific mandate [in that case].... In the present case, no such congressional mandate exists, and the involved statute, 18 U.S.C. § 1001, says nothing whatever about "filing" or place of filing. [Section 3237] is therefore applicable.

Because § 1001 proscribes making or using any false documents, and because the false documents in this case were made in the Southern District of New York, venue there was proper....

746 F.2d at 165 (citations omitted).

*Mendel* and *Herberman,* then, further support a ruling that § 1001 is a continuous crime. Thus, under § 3237, venue for the § 1001 count of the indictment is proper wherever Stemple's crime began, continued or completed itself.

The Court's finding that § 1001 is a continuous crime, however, does not end the venue inquiry; the Court must still go through the *Beddow* factors to determine where venue is proper. As with the possession count against Landies, the Court does not find a sufficient nexus with this district to keep Count VII here. Once again, the locus of the acts making up the elements of the crime—the making of a statement that is false—and the place where those acts were felt favor Ohio (and D.C.) over Michigan. Furthermore, the Court has already stated that its superior factfinding capabilities with respect to the counts in the indictment are not so great so as to provide the sole basis for keeping various counts here in Michigan. The competing factors, then, favor transferring venue to the Southern District of Ohio.[21] Therefore, the Court will exercise its power under Fed.R.Crim.P. 21(b) and send Count VII charging Defendant Stemple with making false statements to that district.

---

21. The Court prefers to send this count to the Southern District of Ohio rather than the D.C. District because of judicial economy considerations. By sending this count to Ohio, Stemple will stand trial for his false filing charge in a single proceeding with Landies' unlawful possession charge.

### 4. *Disclosure Of Tax Returns And Tax Return Information.*

Stemple's final argument in his motion to quash the search warrant, suppress evidence and dismiss the indictment is that the Government wrongfully disclosed the official ATF Form 3 transfer papers that he filed with that agency. *See* I.R.C. § 6103. Stemple moves for suppression of this evidence and dismissal of the indictment, arguing that the criminal and civil penalties provided for in the Tax Code for violation of § 6103 are inadequate. *See* I.R.C. §§ 7213(a) (willful disclosure of records by federal employee is a felony punishable by five years, $5,000 or both); 7431(a) (knowing or negligent disclosure of protected information by a federal employee can lead to civil liability).

I.R.C. § 6103(a) provides:

Returns and return information shall be confidential, and except as authorized by this title—

(1) no officer or employee of the United States ...

shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section.

Subsection (b) goes on to define certain terms:

(1) **Return.**—The term "return" means any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary [of the Treasury] by, or on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

(2) **Return information.**—The term "return information" means—

(A) a taxpayer's identity ... or any other data received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return ...

(3) **Taxpayer return information.**—The term "taxpayer return information" means return information as defined in paragraph (2) which is filed with or furnished to the Secretary by or on behalf of the taxpayer to whom such return information relates.

I.R.C. § 6103(b).

Importantly, the statute also defines "tax administration," and it does so in very broad terms:

The term "tax administration"—

(A) means—

(i) the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws *or related statutes* ...

I.R.C. § 6103(b)(4) (emphasis added).

Stemple argues—and, for the purposes of this motion only, the Court will assume—that the allegedly false ATF Form 3s he filed are tax returns containing taxpayer return information within the meaning of § 6103(b).[22] Stemple goes on to claim that no one has followed the proper procedures for disclosing those forms at any point in this investigation and prosecution.

The Government counters that § 6103(h) permitted it to disclose the ATF Form 3s and information contained therein. That section allows the review of tax returns and tax return information by the Treasury Department, the Department of Justice, and the courts in tax administration matters.[23]

---

**22.** The Government argues that the Treasury Department does not treat ATF Form 3s as returns or taxpayer return information protected by § 6103. Stemple counters with two ATF Chief Counsel opinions to the contrary. *See* Chief Counsel Op. 22541 (refusing to give the registration status of a firearm registered with ATF because the registration was a "return" protected by § 6103); Chief Counsel Op. 22889 (holding, *inter alia*, that transferee's identity on transfer forms was tax return information under § 6103). As noted in the text, the Court will assume for

the sake of argument that ATF Form 3s are indeed tax returns containing tax return information.

**23.** The Government also suggests that any disclosures of Stemple's ATF Form 3s were properly made pursuant to 6103(i)(3)(A). That statute states:

[T]he Secretary may disclose in writing return information (other than taxpayer return information) which may constitute evidence of a

Stemple counters that this is not a tax administration matter, but, rather a criminal one. Thus, Stemple argues that the Government failed to follow the dictates of section 6103(i), which sets out detailed procedures for the disclosure of returns and taxpayer return information in non-tax administration prosecutions. These procedures hinge on getting a court order to the Secretary of the Treasury to disclose the records to non-Treasury employees prior to any disclosures taking place. It is undisputed that the Government did not get such an order before showing the forms to prosecutors, grand jurors, the Court and the public (through the indictment), and perhaps also to certain witnesses.

The Court must note as an initial matter that the factual record regarding Stemple's § 6103 argument is far from developed. The Court has not been advised on exactly who saw the relevant ATF Form 3s or any information contained therein, and when. In addition, the record is unclear on precisely when the Government converted the prosecution in this case from one based on violations of the National Firearms Act (found in the Tax Code) and the Gun Control Act (found in Title 18). Stemple has conceded that this conversion occurred at some point in the grand jury proceedings. Stemple's Brief, p. 35.

 The Court does not see the need to resolve the issue of whether the Government violated § 6103's confidentiality provisions in its investigation or prosecution of this case. This is because even if the Court were to hold that § 6103 was violated because (1) this is a non-tax administration case, and (2) the Government failed to follow the proper procedures for disclosing the information in such a matter, it is largely settled that suppression and dismissal are inappropriate remedies for such a violation.

violation of any Federal criminal law (not involving tax administration) to the extent necessary to apprise the head of the appropriate Federal agency charged with the responsibility of enforcing such law. The head of such agency may disclose such return information to officers and employees of such agency to the extent necessary to enforce such law.

The Court does not find this subsection to be applicable to this case. That section protects only the disclosure of return information other

The majority of courts that have reached this issue have held that Congress intended that the criminal and civil penalties set out in I.R.C. §§ 7213 and 7431 are the sole avenues for relief for violations of § 6103. The leading case on this question is *United States v. Michaelian*, 803 F.2d 1042 (9th Cir.1986). In that case, defendant sought suppression or dismissal on the ground that "the IRS violated the confidentiality requirements of I.R.C. § 6103(h) by disclosing his [income] tax return to the Department of Justice ("DOJ") in October of 1982, several months before a grand jury investigation of [defendant] was authorized under I.R.C. § 7602 [governing referrals of matters by the Treasury Department to the DOJ for prosecution]." 803 F.2d at 1048–49 (footnotes omitted). The Ninth Circuit rejected this argument because it believed the statutory remedies set out in § 6103 were exclusive:

> It is clear that Congress specifically provided criminal penalties for unauthorized disclosure of tax return information in violation of § 6103. *See* I.R.C. § 7213, 18 U.S.C. § 1905; *United States v. Chemical Bank*, 593 F.2d 451, 457 (2d Cir.1979). This Court has previously demonstrated its reluctance to imply a judicial remedy for violations of § 6103 given Congress' explicit provision of a remedy.... Other circuits have reached similar conclusions. *See, e.g., Marvin v. United States*, 732 F.2d 669, 673 (8th Cir.1984); *United States v. Barnes*, 604 F.2d 121, 146 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Indeed, no court has held that a § 6103 violation warrants dismissal or suppression.

*Michaelian*, 803 F.2d at 1049 (certain citations omitted).

The *Michaelian* court went on to distinguish the few cases which arguably support Stemple's argument for suppression:

than "tax returns" or "taxpayer return information" as defined in § 6103. As noted in the text above, the Court is assuming for the purposes of this motion only that ATF Form 3s and the information contained therein are, indeed, tax returns and taxpayer return information. Therefore, the Court sees no grounds for reliance on § 6103(i)(3)(A) as an alternative basis for its denial of Stemple's motion for suppression or dismissal because of illegal disclosures.

The Second Circuit has suggested in dictum that suppression might be available for a § 6103 violation, *see United States v. Chemical Bank*, 593 F.2d 451, 458 (2d Cir. 1979), and one U.S. District Court has relied upon the *Chemical Bank* dictum in setting aside portions of a[ ] [search warrant] affidavit which relied on unauthorized disclosures in violation of § 6103, *see United States v. Lavin*, 604 F.Supp. 350, 356 (E.D.Pa.1985). The *Lavin* case involved a warrant unrelated to tax administration, however; the illegal disclosure of tax information supported a warrant for narcotics evidence. *Lavin* relied on the fact that disclosure was not made in a tax administration matter, as required by § 6103(h), and, thus, required [for disclosure] a court order under § 6103(i)(1)(B) [24]. *See id.* Moreover, *Lavin* relies solely upon *Chemical Bank*'s dictum and omits discussion of other, then existing contrary authority such as *Marvin* and *Barnes*. Here, tax administration is at issue and thus § 6103(h)(2) applies, instead of § 6103(i)(1)(B) as applied in *Lavin*. Other authorities cited by Michaelian discuss dismissal as a remedy for violation of other tax statutes which do not embody legislatively created remedies, and involve bad faith and flagrant government overreaching not present in this case....

*Michaelian*, 803 F.2d at 1049 (certain citations omitted). *Accord United States v. Sumpter*, 133 F.R.D. 580, 584–85 (D.Neb. 1990).

The Court agrees with the *Michaelian* line of cases. Because Congress has indicated what it believes to be the proper remedies for any violations of § 6103, the Court will limit Stemple to them.

Further support for the fact that suppression or dismissal is not the proper remedy for a violation of § 6103 can be found in subsection (i)(4)(E) of the statute, which states:

> The admission into evidence of any return or return information contrary to the provisions of this paragraph (permitting admission of returns and return information in non-tax administration proceedings) shall not, as such, constitute reversible error upon appeal of a judgment in the proceeding.

Finally, were the Court to rule on the issue, it would be inclined to find that the "tax administration" exception to § 6103's confidential requirements would be applicable here to protect any disclosure to at least Government agents.[25] The definition for "tax administration" matters, quoted above, includes statutes "related to" internal revenue laws. The machinegun possession, conspiracy, and false statement statutes at issue in this case are all tied into Stemple's use, and that of his Co–Defendants, of ATF forms which are required to be filed under the Internal Revenue Code. By prosecuting the crimes alleged in the indictment, then, the Government is enforcing, albeit indirectly, the proper use of these tax forms. Arms dealers in the future will simply be less likely to misuse the mandatory filings set out in the I.R.C. if they know that they will face the criminal penalties set out in Title 18 with little or no protection from § 6103.

For the foregoing reasons, then, the Court denies Stemple's motion to suppress the ATF Form 3s he filed and any information therein contained, or to dismiss the indictment, regardless of whether a violation of § 6103 occurred.

## C. *STEMPLE'S MOTION FOR SEVERANCE.*

■■■ Stemple also wants to sever his trial from that of his Co–Defendants because he

---

**24.** Section 6103(i)(1)(B) requires agents of the Department of Justice to apply for a court order prior to reviewing tax returns or tax return information in non-tax administration matters.

**25.** Stemple also argues that ATF and DOJ agents disclosed the Form 3s and Form 3 information to non-government witnesses. Such disclosures do not appear to generally fall with the exception to § 6103's confidentiality requirements found in subsection (h). *But see* I.R.C. Reg. § 301.6103(*l*)–(h)(2)–1) (permitting disclosures by DOJ agents to third persons as part of a grand jury proceeding or an investigation leading to such a proceeding). However, as this Court has no record evidence of such disclosures, they would not at this stage be a basis for a decision that § 6103 was violated.

intends to call Hunter as a witness to inquire into his activities as an ATF informant during the period in which the machinegun conversion kit registrations and transfers took place. As noted in *Hunter I*, 843 F.Supp. at 255, the Court has conducted an *in camera* review of ATF records on Daniel Hunter's activity as a confidential informant. These records reveal that Hunter received a total of $700 for information that he provided to ATF from approximately July, 1986, to January, 1989 on four unrelated investigations.

Severance should only be granted when there will be "compelling prejudice." *United States v. Moreno*, 933 F.2d 362, 369 (6th Cir.), *cert. denied sub. nom. Morris v. United States*, — U.S. —, 112 S.Ct. 265, 116 L.Ed.2d 218 (1991). Here, just as in *Hunter I* with respect to an identical motion for severance by a defendant in this case's companion case, the Court does not see any compelling prejudice in forcing Hunter and Stemple to be tried together because Hunter provided unrelated information to the Government. There is no evidence that there was any *quid pro quo* for Hunter's assistance other than the money he received for his information. Thus, severance would be improper.

### D. *LANDIES' MOTION TO RECONSIDER.*

■ In *Hunter I*, the Court rejected Defendants' attempt to strike out of the indictment Count VIII (charging Hunter, Stemple and Dodson with engaging in the unlicensed dealing in firearms in violation of §§ 922(a)(1)(A) and 922(a)(2) [26]) and those portions of the conspiracy count which invoke statutes regulating "firearms" rather than "machineguns." [27] *See Hunter I*, 843 F.Supp. at 256. Their argument, made again in Landies' February 25 motion for reconsideration, was that while conversion kits are "machineguns" as defined by Title 18, and

are, thus, subject to that title's regulations on machineguns, they are not "firearms" as defined by 18 U.S.C. § 921(a)(3). Defendants argue, therefore, that those portions of the indictment invoking Title 18 sections which only regulate firearms should be stricken. [28]

In Landies' original motion for reconsideration, he relied upon the following evidence to suggest that the Court erred in its interpretation that Title 18's definition of "firearms" included machinegun conversion kits:

1. Papers filed in the case of *Warin v. Director, Bureau of Alcohol Tobacco & Firearms*, No. C 80–210 (N.D.Ohio October 14, 1983) (Walinski, J.). These papers include Judge Walinski's unpublished 1983 decision holding, *inter alia*, that conversion kits are not Title 18 firearms. Judge Walinski relied upon an affidavit by then acting ATF Director Stephen Higgins stating that under the then existing definitions of firearms for Title 18 and Title 26, conversion kits were firearms only under Title 26. The government in that case was the party arguing for the interpretation that Judge Walinski made.

2. An "FFL Newsletter" issued sometime in 1989 to, according to Landies, "all federal firearms dealers." This newsletter states, in relevant part:

> There is apparently some confusion among Class 3 dealers as to whether a Firearms Transaction Record, ATF Form 4473, is required on Title II (NFA) firearms. A Firearms Transaction Record is required for every sale or disposition to a licensee of a weapon that falls under Title I of the Gun Control Act. This definition covers all Title II (NFA) weapons except machinegun conversion kits.

---

**26.** See *supra* nn. 5 & 11 for the text of §§ 922(a)(1)(A) and 922(a)(2).

**27.** More specifically, the conspiracy count, in addition to alleging a conspiracy to violate § 922(o), also alleges a conspiracy to violate § 922(a)(1)(A) and § 923(g)(1)(A). See *supra* n. 7 for the full text of § 923(g)(1)(A).

**28.** Importantly, Landies makes clear that he has never argued that conversion kits are not "machineguns" as defined in Title 18. Thus, Defendants do not dispute the fact that the machinegun possession counts (Counts II–VI), the false statement count (Count VII), and the conspiracy count with respect to its allegations of conspiracy to violate § 922(o) can all go forward.

The Government responded that the materials in the *Warin* case have no precedential value because Title 18's incorporation of Title 26's definition of "machinegun"—upon which this Court relied in holding that conversion kits are Title 18 firearms—occurred in 1986, three years after the *Warin* case was handed down. The Court agrees with this argument, and does not find that the *Warin* case materials have any impact on its interpretation of the post–1986 status of machinegun conversion kits as Title 18 firearms.

The Government made no response with respect to the FFL Newsletter, but it did solicit ATF's current position on whether machinegun conversion kits are Title 18 firearms. On July 8, 1994, the Government provided to the Court a memorandum from the Chief Counsel's Office for ATF which stated:

> For purposes of [Title 18], the term "firearm" is defined in 18 U.S.C. § 921(a)(3) to mean:
>
> (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device....
>
> Machinegun conversion kits are not among the items defined as firearms by section 921(a)(3). Therefore, machinegun conversion kits are not subject to regulation as firearms under [Title 18]. For example, a person engaged in the business of dealing only in such kits would not be required to obtain a license as a dealer in firearms under [Title 18]. Also, a person who transferred a machinegun conversion kit to a felon or other person prohibited from receiving or possession firearms would not violate 18 U.S.C. § 922(d) [barring transfer of firearms by licensed firearm dealers to certain classes of people],

> nor would the prohibited person's receipt or possession of the kit violate 18 U.S.C. § 922(g) [the felon-in-possession, et al. statute].
>
> However, machinegun conversion kits are within the definition of "machinegun" for purposes of [Title 18] and are, therefore, subject to all [Title 18] controls imposed upon "machineguns." For [Title 18] purposes, the definition of "machinegun" in 18 U.S.C. § 921(a)(23) incorporates the definition of such term in the National Firearms Act, I.R.C. § 5845(b). As defined by section 5845(b), "machinegun" means, among other things, "any ... combination of parts designed and intended for use in converting a weapon into a machinegun", *i.e.*, a machinegun conversion kit. Thus, under [Title 18], a machinegun conversion kit is, for example, a machinegun subject to the prohibition with respect to possession and transfer of machineguns in 18 U.S.C. § 922(o) and the prohibition in 18 U.S.C. § 922(a)(4) against transporting machineguns interstate without the approval of the Secretary of the Treasury.

Given the Chief Counsel of ATF's clear position on the issue of whether machinegun conversion kits are Title 18 "firearms," the Court must now decide whether to accept or reject this interpretation. The Court must first point out that ATF's position is in the form of an opinion letter, and, thus, is entitled to no special deference by this Court. *See* Kenneth Culp Davis & Richard J. Pierce, Jr., 1 *Administrative Law Treatise* § 3.5 (3d ed. 1994).

The Court also believes (1) that Congress clearly intended that machinegun conversion kits were to be subject to Title 18's provisions on firearms when it amended the Gun Control Act in 1986 to include 18 U.S.C. § 921(a)(23), which, in turn, incorporates Title 26's broad definition of machineguns, and (2) that this is the only reasonable reading of the statute.[29] As the Court pointed out in its

---

**29.** It is well settled that if an agency's interpretation of a statute conflicts with clear Congressional intent, or is an unreasonable reading of the statute, then a court need not give that interpretation any deference. *See Demarest v. Manspeaker*, 498 U.S. 184, 189, 111 S.Ct. 599, 603, 112 L.Ed.2d 608 (1991) ("[A]dministrative interpreta-

tion of a statute contrary to the language as plain as we find here is not entitled to deference."); *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 841–843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give

previous opinion, it is simply nonsensical to say that Congress intended after the 1986 amendments to the Gun Control Act to regulate machinegun conversion kits as "machineguns" but not as "firearms."

In *Hunter I,* the Court reasoned:

18 U.S.C. § 921(a)(3) defines "firearm" as "(A) any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive...." 18 U.S.C. § 921(a)(23) states: "The term 'machinegun' has the meaning given such term in [I.R.C.] § 5845(b) of the National Firearms Act." Finally, I.R.C. § 5845(b) (emphasis added) reads:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun,* and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

From these statutes, the Court concludes that § 921(a)(3) (definition of firearm) incorporates § 921(a)(23) (definition of machinegun) which, in turn, incorporates § 5845(b) (definition of machinegun in the NFA, which includes conversion kits). The Court does not see how else one could read these provisions. If Defendants believe that conversion kits are not in and of themselves "weapons" under § 921(a)(3), they forget that that section clearly envisions machineguns as weapons. And, § 921 further defines "machinegun" with reference to § 5845(b), which includes conversion kits. Therefore, reading the statutes together it is indisputable that conversion kits are [firearms] under Title 18.

843 F.Supp. at 256. Because the Court adheres to this analysis, despite Defendants' protestations, it sees no reason to vacate or modify its earlier ruling.

However, the Court also believes that if the U.S. Department of the Treasury, and not merely ATF's Chief Counsel, is truly of the opinion that Defendants' actions with respect to conversion kits do not violate Title 18's regulations of "firearms," then the Government should not prosecute them for these alleged violations. Thus, should the Department of the Treasury concur in the ATF Chief Counsel's opinion, the Court will entertain a motion by the Government to strike from the indictment those portions which allege violations of Title 18's regulation of "firearms."

### III. *CONCLUSION*

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant Stemple's motion to quash the search warrant, suppress evidence and dismiss the indictment is DENIED, except that venue for the possession count against Defendant Landies and the false filing count against Defendant Stemple is hereby transferred to the U.S. District Court for the Southern District of Ohio.

IT IS FURTHER ORDERED that Defendant Stemple's motion for a severance is DENIED.

IT IS FURTHER ORDERED that Defendant Landies' motion for reconsideration is DENIED. However, should the U.S. Department of the Treasury concur with the opinion expressed by ATF's Chief Counsel regarding whether machinegun conversion kits are Title 18 firearms, then the Court will entertain a motion by the Government to strike those portions of the indictment which allege violations of Title 18's regulations on firearms.

effect to the unambiguously expressed intent of Congress.... [I]f the statute is silent or ambiguous with respect to the specific issue, the ques-

tion for the court is whether the agency's answer is based on a permissible construction of the statute.") (footnotes omitted).